Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

_____ Civil_____ Division

MAY 0 5 2023

**MITCHELL R. ELFERS**
**CLERK**

|  |  |  |
|---|---|---|
| John Bellocchio, Attorney Pro Se | ) | Case No. **CV 23-390** |
|  | ) |  |
|  | ) | *(to be filled in by the Clerk's Office)* |
|  | ) |  |
| *Plaintiff(s)* | ) |  |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) |  |
| -v- | ) |  |
|  | ) |  |
| New Mexico Office of the Secretary of State, Secretary of State Maggie Toulouse Oliver, Deputy Secretary of State Sharon Pino, Mandy Vigil, Deputy Secretary of State for Elections | ) |  |
|  | ) |  |
|  | ) |  |
| *Defendant(s)* | ) |  |
| *(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) |  |

## COMPLAINT AND REQUEST FOR INJUNCTION

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | John Bellocchio |
| Street Address | PO Box 99 |
| City and County | Oakland, Bergen County |
| State and Zip Code | New Jersey 07436 |
| Telephone Number | 201.914.8268 |
| E-mail Address | bellocchioj@outlook.com |

#### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Office of the Secretary of State of New Mexico |
| Job or Title *(if known)* | |
| Street Address | 325 Don Gaspar, Suite 300 |
| City and County | Santa Fe, Santa Fe County |
| State and Zip Code | New Mexico 87501 |
| Telephone Number | 505.827.3600 |
| E-mail Address *(if known)* | maggie.toliver@sos.nm.gov |

Defendant No. 2

| | |
|---|---|
| Name | Maggie Toulouse-Oliver |
| Job or Title *(if known)* | New Mexico Secretary of State |
| Street Address | 325 Don Gaspar, Suite 300 |
| City and County | Santa Fe, Santa Fe County |
| State and Zip Code | New Mexico 87501 |
| Telephone Number | 505.827.3600 |
| E-mail Address *(if known)* | maggie.toliver@sos.nm.gov |

Defendant No. 3

| | |
|---|---|
| Name | Sharon Pino |
| Job or Title *(if known)* | Deputy Secretary of State |
| Street Address | 325 Don Gaspar, Suite 300 |
| City and County | Santa Fe, Santa Fe County |
| State and Zip Code | New Mexico 87501 |
| Telephone Number | 505.827.3600 |
| E-mail Address *(if known)* | sharon.pino@sos.nm.gov |

Defendant No. 4

| | |
|---|---|
| Name | Mandy Vigil |
| Job or Title *(if known)* | Deputy Secretary of State for Elections |
| Street Address | 325 Don Gaspar, Suite 300 |
| City and County | Santa Fe, Santa Fe County |
| State and Zip Code | New Mexico 87501 |
| Telephone Number | 505.827.3600 |
| E-mail Address *(if known)* | mandy.vigil@sos.nm.gov |

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

## II.   Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction?  *(check all that apply)*

☑ Federal question        ☑ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.   If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.
11th Amendment to the United States Constitution, as attached.  18 USC 2474, Aiding and Abetting the Comission of a Crime, 18 USC 242, Deprivation of Rights Under Color of Law - all as attached and demarcated

### B.   If the Basis for Jurisdiction Is Diversity of Citizenship

1.   The Plaintiff(s)

a.   If the plaintiff is an individual

The plaintiff, *(name)*  John Bellocchio                      , is a citizen of the State of *(name)*  New Jersey                      .

b.   If the plaintiff is a corporation

The plaintiff, *(name)*                      , is incorporated under the laws of the State of *(name)*                      , and has its principal place of business in the State of *(name)*

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.   The Defendant(s)

a.   If the defendant is an individual

The defendant, *(name)*                      , is a citizen of the State of *(name)*                      . Or is a citizen of *(foreign nation)*

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

b.    If the defendant is a corporation

The defendant,  *(name)*  New Mexico Secretary of State    , is incorporated under

the laws of the State of *(name)*    New Mexico    , and has its

principal place of business in the State of *(name)*   New Mexico    .

Or is incorporated under the laws of *(foreign nation)*    ,

and has its principal place of business in *(name)*    .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:
Non-monetary claim

## III.   Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the injunction or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.    Where did the events giving rise to your claim(s) occur?
As attached

B.    What date and approximate time did the events giving rise to your claim(s) occur?
As attached

C.   What are the facts underlying your claim(s)?  *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

As attached

## IV.   Irreparable Injury

Explain why monetary damages at a later time would not adequately compensate you for the injuries you sustained, are sustaining, or will sustain as a result of the events described above, or why such compensation could not be measured.

As attached

## V.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

As attached

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:      04/30/2023

Signature of Plaintiff

Printed Name of Plaintiff    John Bellocchio

### B. For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW MEXICO**

—---------------------------------------------------

John Bellocchio, Plaintiff,

-against-

Defendants,

Office of the New Mexico Secy. of State.
Maggie Toulous-Oliver, NM Secy. of State
Sharon Pino, NM Deputy Secy. of State
Mandy Vigil, NM Deputy Secy. of State - Elections

------------------------------------------

**ORDER TO SHOW CAUSE**
**Docket No.**

Upon the affidavit and attached complaint of John Bellocchio, sworn to on the 30th of April, 2023, and upon the copy of the complaint hereto attached, it is ORDERED that the above named defendants show before this Court at Room_____, _____ (DATE), United States Courthouse Santa Fe, New Mexico, at _____ o'clock thereof, or as soon thereafter as counsel may be heard, why an order should not be issued pursuant to Rule 11(b) and 11(c) of the Federal Rules of Civil Procedure as follows: Plaintiff demands that the Court, based on the enclosed complaint and exhibits, pursuant to Federal Law, direct the New Mexico Secretary of State to immediately suspend the certificate in good standing of the non-profit organization known as the Servants of the Paraclete at Jemez Springs, New

Mexico, *an organization that is willfully violating federal laws 18 USC §242 (concurrent with the NM Secretary of State), 18 USC §2474, and 18 USC §1341 with the direct consent of the New Mexico Secretary of State*, and it is further ordered that a copy of this order, together with the papers upon which it is granted, be personally served upon the defendants on or before_____, and that such service be deemed good and sufficient


Dated:


_____

UNITED STATES DISTRICT JUDGE


I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on: April 30th, 2023

_____

JOHN BELLOCCHIO

**STATEMENT OF CLAIM AND COMPLAINT**

A. The events giving rise to the claim all occurred in the State of New Mexico.

B. The events began in February, 2023 and are continuing to the present.

C. STATEMENT OF FACTS OF COMPLAINT:

    a. *NOTE: This matter was previously brought before the New Mexico State Ethics Commission which determined it did not have jurisdiction, making Federal District Court the appropriate venue for remedy.*

    b. On information and belief, the State of New Mexico has been fully aware of a pseudo-religious organization called the "Servants of the Paraclete" existing in Jemez Springs, Sandoval County, New Mexico. (See Exhibits)

    c. On information and belief, the State of New Mexico has known about the dangers of this organization since at least 1954. (See Exhibits)

    d. On information and belief, the New Mexico Secretary of State, currently Maggie Toulouse-Oliver, is responsible for the regulation of religious non-profit organizations.

    e. The current occupant of that Office, Toulouse-Oliver, and all of her predecessors have known that the Servants of the Paraclete are, in fact, nothing more than a criminal organization masquerading as a charity. (See Exhibits)

    f. This matter was originally referred to the Attorney General of New Mexico; that Office directed that the Secretary of State was responsible for the Servants of the Paraclete due to their so-called religious purpose.

    g. The New Mexico Secretary of State has denied that they regulate this organization, despite publicly displaying their "certificate of good standing" in the Office's database of charities "in good standing."

    h. As a result of the New Mexico Secretary of State keeping an organization they know, factually and through evidence, has as its sole purpose the aiding and abetting of credibly accused/convicted pedophile priests from facing criminal and civil justice, the organization has been able to open and operate facilities housing dangerous pedophile priests throughout the United States.

i.   Due to interstate reciprocity rules, the Servants of the Paraclete have been able to open a veritable chain of pedophile priest houses from New Mexico to the Philadelphia Metropolitan Area.

*j.   As the organization is able to conduct business only through the legitimacy created by the NM Secretary of State, the NM Secretary of State is therefore working with the and assisting the Servants of the Paraclete to violate 18 USC §242, 18 USC §2474, and 18 USC §1341*

k.   As the Servants of the Paraclete clearly and obviously violate New Mexico and Federal Law, the Secretary of State has a statutory obligation to remove said organization's certificate of good standing, which they have declined to do, stating they do not have the authority to do so.  Their argument would indicate that any non-profit in the State of New Mexico registered as in good standing with the Secretary of State has the ability to violate local, state, and federal law with complete impunity.

l.   As a result of the abject failure of regulation created by defendants' actions, convicted pedophile priests wanted for criminal and civil justice are able to live freely in communities, endangering children in those local communities, without any fear of consequence.  The Servants of the Paraclete own dozens of facilities in neighborhoods filled with children, scoff at the sex offender registry laws, and continue to be able to expand due to the protection afforded by the good standing certificate available through the New Mexico Secretary of State.

m.   The Secretary of State is therefore responsible of the flight of pedophile priests from justice, and responsible for endangering children in New Mexico and throughout the United States, since the Servants of the Paraclete are entirely unregulated; it should be noted that my abuser was hidden by this organization, and even given his global profile, he was able to hide in plain view.

**IRREPARABLE INJURY:**

Plaintiff has suffered irreparable injury because the Servants of the Paraclete are allowed to prosper in New Mexico, shielding individuals who may wish to bring further harm to the plaintiff, from justice, including those who may be inspired by political rhetoric to commit acts of violence.  In the current highly polarized environment, holding religious entities to account is indeed a dangerous undertaking, and comes with the risk of assault or death or death threats. Being perceived as "anti-Judeo-Christian," is, at this point in our history, dangerous. The New Mexico Secretary of State has allowed the Servants of the Paraclete to raise enormous sums of money via US Mail while shielding pedophile priests from justice due to their keeping the organization's "good standing" status.  This creates a significant potential danger to the plaintiff, his livelihood which requires interstate travel, and, by extension, to every victim of clerical sexual abuse in the United States.  Further, the New Mexico Secretary of State, in allowing the Servants of the Paraclete to operate without recompense or regulation hiding wanted pedophile priests wherever they would like, deprives plaintiff and other victims of their Constitutional right to due process.

**RELIEF:**

Plaintiff demands that the District Court direct the New Mexico Secretary of State, without delay, to suspend the "certificate of good standing" assigned to the Servants of the Paraclete immediately and until further notice for the reasons set forth above and in the Order to Show Cause.

_____

JOHN BELLOCCHIO

DATED: April 30th, 2023

# 2474. Elements Of Aiding And Abetting

3-4 minutes : 2/19/2015

The elements necessary to convict under aiding and abetting theory are

1. That the accused had specific intent to facilitate the commission of a crime by another;

2. That the accused had the requisite intent of the underlying substantive offense;

3. That the accused assisted or participated in the commission of the underlying substantive offense; and

4. That someone committed the underlying offense.

*United States v. DePace*, 120 F.3d 233 (11th Cir. 1997); *United States v. Chavez*, 119 F.3d 342 (5th Cir. 1997); *United States v. Powell*, 113 F.3d 464 (3d Cir. 1997); *United States v. Sayetsitty*, 107 F.3d 1405 (9th Cir. 1997); *United States v. Leos-Quijada*, 107 F.3d 786 (10th Cir. 1997); *United States v. Stands*, 105 F.3d 1565 (8th Cir.), *cert. denied* (October 6, 1997) (No. 96-9541); *United States v. Pipola*, 83 F.3d 556 (2d Cir.), *cert. denied*, __ U.S. __, 117 S.Ct. 183, 136 L.Ed.2d 122 (1996); *United States v. Chin*, 83 F.3d 83 (4th Cir. 1996); *United States v. Lucas*, 67 F.3d 956, 959 (D.C. Cir. 1995); *United States v. Spinney*, 65 F.3d 231 (1st Cir. 1995); *United States v. Spears*, 49 F.3d 1136 (6th Cir. 1995).

To convict as a principal of aiding and abetting the commission of a crime, a jury must find beyond a reasonable doubt that the defendant knowingly and intentionally aided and abetted the principal(s) in each essential element of the crime. *United States v. Bancalari*, 110 F.3d 1425, 1429 (9th Cir. 1997). The government must prove that the defendant associated with the criminal venture, purposefully participated in the criminal activity, and sought by his actions to make the venture successful. *United States v. Landerman*, 109 F.3d 1053, 1068 n.22 (5th Cir. 1997); *United States v. Griffin*, 84 F.3d 912, 928 (7th Cir.), *cert. denied*, __ U.S. __, 117 S.Ct. 495, 136 L.Ed.2d 387 (1996); *Pipola*, 83 F.3d at 562; *United States v. Lucas*, 67 F.3d 956 (D.C. Cir. 1995); *Spinney*, 65 F.3d at 238; *United States v. Williamson*, 53 F.3d 1500, 1515 (10th Cir. 1995); *United States v. Roach*, 28 F.3d 729, 736-37 (8th Cir. 1991); *United S tates v. Ritter*, 989 F.2d 318, 322 (9th Cir. 1993). A defendant associates with a criminal venture if he shares in the criminal intent of the principal, and the defendant participates in criminal activity if he has acted in some affirmative manner designed to aid the venture. *Landerman*, 109 F.3d at 1068 n.22. The level of participation may be of relatively slight moment. *Leos-Quijada*, 107 F.3d at 794. Also, it does not take much evidence to satisfy the facilitation element once the defendant's knowledge of the unlawful purpose is established. *United States v. Bennett*, 75 F.3d 40, 45 (1st Cir. 1996).

[updated October 1998]

4/30/23, 11:07 AM
Deprivation Of Rights Under Color Of Law
Case 1:23-cv-00390-DHU-JFR   Document 1   Filed 05/05/23   Page 16 of 111
www.justice.gov /crt/deprivation-rights-under-color-law

# Deprivation Of Rights Under Color Of Law

3-4 minutes : 8/6/2015

Skip to main content

# You are here

# Summary:

- Section 242 of Title 18 makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States.

  For the purpose of Section 242, acts under "color of law" include acts not only done by federal, state, or local officials within their lawful authority, but also acts done beyond the bounds of that official's lawful authority, if the acts are done while the official is purporting to or pretending to act in the performance of his/her official duties. Persons acting under color of law within the meaning of this statute include police officers, prisons guards and other law enforcement officials, as well as judges, care providers in public health facilities, and others who are acting as public officials. It is not necessary that the crime be motivated by animus toward the race, color, religion, sex, handicap, familial status or national origin of the victim.

  The offense is punishable by a range of imprisonment up to a life term, or the death penalty, depending upon the circumstances of the crime, and the resulting injury, if any.

TITLE 18, U.S.C., SECTION 242

*Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, ... shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.*

Updated May 31, 2021

# Was this page helpful?

Was this page helpful?

Yes No

www.justice.gov /archives/jm/criminal-resource-manual-940-18-usc-section-1341-elements-mail-fraud

# 940. 18 U.S.C. Section 1341—Elements of Mail Fraud

2-2 minutes : 2/19/2015

## You are here

This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

"There are two elements in mail fraud: (1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." *Schmuck v. United States*, 489 U.S. 705, 721 n. 10 (1989); *see also Pereira v. United States*, 347 U.S. 1, 8 (1954) ("The elements of the offense of mail fraud under . . . § 1341 are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme."); Laura A. Eilers & Harvey B. Silikovitz, *Mail and Wire Fraud*, 31 Am. Crim. L. Rev. 703, 704 (1994) (cases cited).

[cited in JM 9-43.100]

Updated January 21, 2020

Case 1:23-cv-00390-DNH-ML   Document 1   Filed 05/05/23   Page 19 of 111

# Overview of Diversity Jurisdiction | Constitution Annotated | Congress.gov | Library of Congress

4-5 minutes

Article III, Section 2, Clause 1:

The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction; to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State, between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

Article III, Section 2, Clause 1, as interpreted by the Supreme Court, authorizes Congress to grant federal courts subject matter jurisdiction over controversies between citizens of different states—commonly known as "diversity jurisdiction."[1] Although Justice Joseph Story concluded in the early case Martin v. Hunter's Lessee that "the language of [Article III]. . . . is manifestly designed to be mandatory upon the legislature," such that "Congress could not, without a violation of its duty, have refused to carry it into operation,"[2] numerous subsequent Supreme Court decisions repudiated this stance, recognizing instead that Article III's grant of subject matter jurisdiction is permissive and subject to congressional discretion.[3]

Congress has invoked this authority and enacted legislation granting federal courts diversity jurisdiction since the Judiciary Act of 1789.[4] That statute conferred diversity jurisdiction only when a suit was between a citizen of the state in which the suit was brought and a citizen of another state.[5] The Judiciary Act of 1789 further limited diversity jurisdiction to cases where the amount in controversy—that is, the value of the relief sought—was at least $5,000.[6] The Judiciary Act of 1875 eliminated the requirement that one of the parties be a citizen of the forum state, requiring only diverse citizenship and a minimum jurisdictional amount in controversy.[7] The current diversity jurisdiction provision is codified at 28 U.S.C. § 1332, and grants federal court jurisdiction in all civil actions between citizens of different states and between a citizen of a state and a subject of a foreign state if the amount in controversy exceeds $75,000.

Although the broad strokes of these requirements have remained the same since 1875, the statute has grown increasingly complex over the years. For instance, Congress amended the statutory provision via the Class Action Fairness Act of 2005 (CAFA).[8] Among other changes, CAFA expanded federal courts' jurisdiction over class actions by substituting in these cases a minimal diversity-of-citizenship requirement in place of the usual complete diversity requirement, which requires each plaintiff be a citizen of a different state from each defendant. Under the minimal diversity requirement, federal courts possess diversity jurisdiction over a class action when any one of the plaintiffs is a citizen of a different state from any defendant.[9] CAFA also imposed an

amount-in-controversy threshold of $5,000,000 in class actions, and allowed plaintiffs to aggregate their monetary claims to calculate the statutory amount in controversy.[10]

The following essays do not cover the extensive case law interpreting the various statutory requirements for diversity jurisdiction.[11] They instead provide an overview of the constitutional parameters of diversity jurisdiction, including a historical perspective on the purpose of diversity jurisdiction; the Supreme Court's interpretations of the meaning of "citizens of different states" under Article III; and related federalism principles implicated by diversity jurisdiction.

# 28 USC 1331: Federal question

4-5 minutes

## §1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

(June 25, 1948, ch. 646, 62 Stat. 930 ; Pub. L. 85–554, §1, July 25, 1958, 72 Stat. 415 ; Pub. L. 94–574, §2, Oct. 21, 1976, 90 Stat. 2721 ; Pub. L. 96–486, §2(a), Dec. 1, 1980, 94 Stat. 2369 .)

**Historical and Revision Notes**

Based on title 28, U.S.C., 1940 ed., §41(1) (Mar. 3, 1911, ch. 231, §24, par. 1, 36 Stat. 1091 ; May 14, 1934, ch. 283, §1, 48 Stat. 775 ; Aug. 21, 1937, ch. 726, §1, 50 Stat. 738 ; Apr. 20, 1940, ch. 117, 54 Stat. 143 ).

Jurisdiction of federal questions arising under other sections of this chapter is not dependent upon the amount in controversy. (See annotations under former section 41 of title 28, U.S.C.A., and 35 C.J.S. p. 833 et seq. §§30–43. See, also, reviser's note under section 1332 of this title.)

Words "wherein the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs," were added to conform to rulings of the Supreme Court. See construction of provision relating to jurisdictional amount requirement in cases involving a Federal question in *United States v. Sayward*, 16 S.Ct. 371, 160 U.S. 493, 40 L.Ed. 508; *Fishback v. Western Union Tel. Co.*, 16 S.Ct. 506, 161 U.S. 96, 40 L.Ed. 630; and *Halt v. Indiana Manufacturing Co.*, 1900, 20 S.Ct. 272, 176 U.S. 68, 44 L.Ed. 374.

Words "all civil actions" were substituted for "all suits of a civil nature, at common law or in equity" to conform with Rule 2 of the Federal Rules of Civil Procedure.

Words "or treaties" were substituted for "or treaties made, or which shall be made under their authority," for purposes of brevity.

The remaining provisions of section 41(1) of title 28, U.S.C., 1940 ed., are incorporated in sections 1332, 1341, 1342, 1345, 1354, and 1359 of this title.

Changes were made in arrangement and phraseology.

**Editorial Notes**

**Amendments**

**1980**-Pub. L. 96–486 struck out "; amount in controversy; costs" in section catchline, struck out minimum amount in controversy requirement of $10,000 for original jurisdiction in federal question cases which necessitated striking the exception to such required minimum amount that authorized original jurisdiction in actions brought against the United States, any agency thereof, or any officer or employee thereof in an official capacity, struck out provision authorizing the district court except where express provision therefore was made in a federal statute to deny costs to a plaintiff and in fact impose such costs upon such plaintiff where plaintiff was adjudged to be entitled to recover less than the required amount in controversy, computed without regard to set-off or counterclaim and exclusive of interests and costs, and struck out existing subsection designations.

**1976**-Subsec. (a). Pub. L. 94–574 struck out $10,000 jurisdictional amount where action is brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

**1958**-Pub. L. 85–554 included costs in section catchline, designated existing provisions as subsec. (a), substituted "$10,000" for "$3,000", and added subsec. (b).


**Statutory Notes and Related Subsidiaries**

**Effective Date of 1980 Amendment; Applicability**

Pub. L. 96–486, §4, Dec. 1, 1980, 94 Stat. 2370 , provided: "This Act [amending this section and section 2072 of Title 15, Commerce and Trade, and enacting provisions set out as a note under section 1 of this title] shall apply to any civil action pending on the date of enactment of this Act [Dec. 1, 1980]."

**Effective Date of 1958 Amendment**

Pub. L. 85–554, §3, July 25, 1958, 72 Stat. 415 , provided that: "This Act [amending this section and sections 1332 and 1345 of this title] shall apply only in the case of actions commenced after the date of the enactment of this Act [July 25, 1958]."

www.justice.gov /archives/jm/criminal-resource-manual-2474-elements-aiding-and-abetting

# 2474. Elements Of Aiding And Abetting

3-4 minutes : 2/19/2015

The elements necessary to convict under aiding and abetting theory are

1. That the accused had specific intent to facilitate the commission of a crime by another;

2. That the accused had the requisite intent of the underlying substantive offense;

3. That the accused assisted or participated in the commission of the underlying substantive offense; and

4. That someone committed the underlying offense.

*United States v. DePace*, 120 F.3d 233 (11th Cir. 1997); *United States v. Chavez*, 119 F.3d 342 (5th Cir. 1997); *United States v. Powell*, 113 F.3d 464 (3d Cir. 1997); *United States v. Sayetsitty*, 107 F.3d 1405 (9th Cir. 1997); *United States v. Leos-Quijada*, 107 F.3d 786 (10th Cir. 1997); *United States v. Stands*, 105 F.3d 1565 (8th Cir.), *cert. denied* (October 6, 1997) (No. 96-9541); *United States v. Pipola*, 83 F.3d 556 (2d Cir.), *cert. denied*, __ U.S. __, 117 S.Ct. 183, 136 L.Ed.2d 122 (1996); *United States v. Chin*, 83 F.3d 83 (4th Cir. 1996); *United States v. Lucas*, 67 F.3d 956, 959 (D.C. Cir. 1995); *United States v. Spinney*, 65 F.3d 231 (1st Cir. 1995); *United States v. Spears*, 49 F.3d 1136 (6th Cir. 1995).

To convict as a principal of aiding and abetting the commission of a crime, a jury must find beyond a reasonable doubt that the defendant knowingly and intentionally aided and abetted the principal(s) in each essential element of the crime. *United States v. Bancalari*, 110 F.3d 1425, 1429 (9th Cir. 1997). The government must prove that the defendant associated with the criminal venture, purposefully participated in the criminal activity, and sought by his actions to make the venture successful. *United States v. Landerman*, 109 F.3d 1053, 1068 n.22 (5th Cir. 1997); *United States v. Griffin*, 84 F.3d 912, 928 (7th Cir.), *cert. denied*, __ U.S. __, 117 S.Ct. 495, 136 L.Ed.2d 387 (1996); *Pipola*, 83 F.3d at 562; *United States v. Lucas*, 67 F.3d 956 (D.C. Cir. 1995); *Spinney*, 65 F.3d at 238; *United States v. Williamson*, 53 F.3d 1500, 1515 (10th Cir. 1995); *United States v. Roach*, 28 F.3d 729, 736-37 (8th Cir. 1991); *United S tates v. Ritter*, 989 F.2d 318, 322 (9th Cir. 1993). A defendant associates with a criminal venture if he shares in the criminal intent of the principal, and the defendant participates in criminal activity if he has acted in some affirmative manner designed to aid the venture. *Landerman*, 109 F.3d at 1068 n.22. The level of participation may be of relatively slight moment. *Leos-Quijada*, 107 F.3d at 794. Also, it does not take much evidence to satisfy the facilitation element once the defendant's knowledge of the unlawful purpose is established. *United States v. Bennett*, 75 F.3d 40, 45 (1st Cir. 1996).

[updated October 1998]

# Suits Against State Officials

15-19 minutes

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

## Annotations

Courts may open their doors for relief against government wrongs under the doctrine that sovereign immunity does not prevent a suit to restrain individual officials, thereby restraining the government as well.[113] The doctrine is built upon a double fiction: that for purposes of the sovereign's immunity, a suit against an official is not a suit against the government, but for the purpose of finding state action to which the Constitution applies, the official's conduct is that of the state.[114] The doctrine preceded but is most noteworthily associated with the decision in *Ex parte Young*,[115] a case that deserves the overworked adjective, seminal.

*Young* arose when a state legislature passed a law reducing railroad rates and providing severe penalties for any railroad that failed to comply with the law. Plaintiff railroad stockholders brought a federal action to enjoin Young, the state attorney general, from enforcing the law, alleging that it was unconstitutional and that they would suffer irreparable harm if he were not prevented from acting. An injunction was granted forbidding Young from acting on the law, an injunction he violated by bringing an action in state court against noncomplying railroads; for this action he was adjudged in contempt. If the Supreme Court had held that the injunction was not permissible, because the suit was one against the state, there would have been no practicable way for the railroads to attack the statute without placing themselves in great danger. They could have disobeyed it and alleged its unconstitutionality as a defense in enforcement proceedings, but if they were wrong about the statute's validity the penalties would have been devastating.[116] On the other hand, effectuating constitutional rights through an injunction would not have been possible had the injunction been deemed to be a suit against the state.

In deciding *Young*, the Court faced inconsistent lines of cases, including numerous precedents for permitting suits against state officers. Chief Justice Marshall had begun the process in *Osborn* by holding that suit was barred only when the state was formally named a party.[117] He presently was required to modify that decision and preclude suit when an official, the governor of a state, was sued in his official capacity,[118] but relying on *Osborn* and reading *Madrazo* narrowly, the Court later held in a series of cases that an official of a state could be sued to prevent him from executing a state law in conflict with the Constitution or a law of the United States, and the fact that the officer may be acting on behalf of the state or in response to a statutory obligation of the state did not make the suit one against the state.[119] Another line of cases began developing a more functional, less formalistic concept of the Eleventh Amendment and sovereign immunity, one that evidenced an increasing

wariness toward affirmatively ordering states to relinquish state-controlled property[120] and culminated in the broad reading of Eleventh Amendment immunity in *Hans v. Louisiana*.[121]

Two of the leading cases, as were many cases of this period, were suits attempting to prevent Southern states from defaulting on bonds.[122] In *Louisiana v. Jumel*,[123] a Louisiana citizen sought to compel the state treasurer to apply a sinking fund that had been created under the earlier constitution for the payment of the bonds after a subsequent constitution had abolished this provision for retiring the bonds. The proceeding was held to be a suit against the state.[124] Then, *In re Ayers*[125] purported to supply a rationale for cases on the issuance of mandamus or injunctive relief against state officers that would have severely curtailed federal judicial power. Suit against a state officer was not barred when his action, aside from any official authority claimed as its justification, was a wrong simply as an individual act, such as a trespass, but if the act of the officer did not constitute an individual wrong and was something that only a state, through its officers, could do, the suit was in actuality a suit against the state and was barred.[126] That is, the unconstitutional nature of the state statute under which the officer acted did not itself constitute a private cause of action. For that, one must be able to point to an independent violation of a common law right.[127]

Although *Ayers* was in all relevant points on all fours with *Young*,[128] the *Young* Court held that the injunction had properly issued against the state attorney general, even though the state was in effect restrained as well. "The act to be enforced is alleged to be unconstitutional, and, if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of the complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional. If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subject in his person to the consequences of his individual conduct."[129] Justice Harlan was the only dissenter, arguing that in law and fact the suit was one only against the state and that the suit against the individual was a mere "fiction."[130]

The "fiction" remains a mainstay of our jurisprudence.[131] It accounts for a great deal of the litigation brought by individuals to challenge the carrying out of state policies. Suits against state officers alleging that they are acting pursuant to an unconstitutional statute are the standard device by which to test the validity of state legislation in federal courts prior to enforcement and thus interpretation in the state courts.[132] Similarly, suits to restrain state officials from taking certain actions in contravention of federal statutes[133] or to compel the undertaking of affirmative obligations imposed by the Constitution or federal laws[134] are common.

For years, moreover, the accepted rule was that suits prosecuted against state officers in feder[al] grounds that they are acting in excess of state statutory authority[135] or that they are not doing something required by state law[136] are not precluded by the Eleventh Amendment or its emanations of sovereign immunity, provided only that there are grounds to obtain federal jurisdiction.[137] However, in *Pennhurst State School & Hospital v. Halderman*,[138] the Court, five-to-four, held that *Young* did not permit suits in federal courts

against state officers alleging violations of *state* law. In the Court's view, *Young* was necessary to promote the supremacy of federal law, a basis that disappears if the violation alleged is of state law. The Court also still adheres to the doctrine, first pronounced in *Madrazo*,[139] that some suits against officers are "really" against the state[140] and are barred by the state's immunity, such as when the suit involves state property or asks for relief which clearly calls for the exercise of official authority, such as paying money out of the treasury to remedy past harms.[141]

For example, a suit to prevent tax officials from collecting death taxes arising from the competing claims of two states as being the last domicile of the decedent foundered upon the conclusion that there could be no credible claim of violation of the Constitution or federal law; state law imposed the obligation upon the officials and "in reality" the action was against the state.[142] Suits against state officials to recover taxes have also been made increasingly difficult to maintain. Although the Court long ago held that the sovereign immunity of the state prevented a suit to recover money in the state treasury,[143] it also held that a suit would lie against a revenue officer to recover tax moneys illegally collected and still in his possession.[144] Beginning, however, with *Great Northern Life Ins. Co. v. Read*,[145] the Court has held that this kind of suit cannot be maintained unless the state expressly consents to suits in the federal courts. In this case, the state statute provided for the payment of taxes under protest and for suits afterward against state tax collection officials for the recovery of taxes illegally collected, which revenues were required to be kept segregated.[146]

In *Edelman v. Jordan*,[147] the Court appeared to begin to lay down new restrictive interpretations of what the Eleventh Amendment proscribed. The Court announced that a suit "seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."[148] What the Court actually held, however, was that it was permissible for federal courts to require state officials to comply in the future with claims payment provisions of the welfare assistance sections of the Social Security Act, but that they were not permitted to hear claims seeking, or issue orders directing, payment of funds found to be wrongfully withheld.[149] Conceding that some of the characteristics of prospective and retroactive relief would be the same in their effects upon the state treasury, the Court nonetheless believed that retroactive payments were equivalent to the imposition of liabilities which must be paid from public funds in the treasury, and that this was barred by the Eleventh Amendment. The spending of money from the state treasury by state officials shaping their conduct in accordance with a prospective-only injunction is "an ancillary effect" which "is a permissible and often an inevitable consequence" of *Ex parte Young*, whereas "payment of state funds . . . as a form of compensation" to those wrongfully denied the funds in the past "is in practical effect indistinguishable in many aspects from an award of damages against the State."[150]

That *Edelman* in many instances will be a formal restriction rather than an actual one is illustrated by *Milliken v. Bradley*,[151] in which state officers were ordered to spend money from the state treasury in order to finance remedial educational programs to counteract the effects of past school segregation; the decree, the Court said, "fits squarely within the prospective-compliance exception reaffirmed by *Edelman*."[152] Although the payments were a result of past wrongs, of past constitutional violations, the Court did not view them as "compensation," inasmuch as they were not to be paid to victims of past discrimination but rather used to better conditions either for them or their successors.[153] The Court also applied *Edelman* in *Papasan v. Allain*,[154] holding that a claim

against a state for payments representing a continuing obligation to meet trust responsibilities stemming from a 19th century grant of public lands for benefit of education of the Chickasaw Indian Nation is barred by the Eleventh Amendment as indistinguishable from an action for past loss of trust corpus, but that an Equal Protection claim for present unequal distribution of school land funds is the type of ongoing violation for which the Eleventh Amendment does not bar redress.

In *Idaho v. Coeur d'Alene Tribe*,[155] the Court further narrowed *Ex parte Young.* The implications of the case are difficult to predict, because of the narrowness of the Court's holding, the closeness of the vote (5–4), and the inability of the majority to agree on a rationale. The holding was that the Tribe's suit against state officials for a declaratory judgment and injunction to establish the Tribe's ownership and control of the submerged lands of Lake Coeur d'Alene is barred by the Eleventh Amendment. The Tribe's claim was based on federal law—Executive Orders issued in the 1870s, prior to Idaho statehood. The portion of Justice Kennedy's opinion that represented the opinion of the Court concluded that the Tribe's "unusual" suit was "the functional equivalent of a quiet title action which implicates special sovereignty interests."[156] The case was "unusual" because state ownership of submerged lands traces to the Constitution through the "equal footing doctrine," and because navigable waters "uniquely implicate sovereign interests."[157] This was therefore no ordinary property dispute in which the state would retain regulatory control over land regardless of title. Rather, grant of the "far-reaching and invasive relief" sought by the Tribe "would diminish, even extinguish, the State's control over a vast reach of lands and waters long . . . deemed to be an integral part of its territory."[158]

A separate part of Justice Kennedy's opinion, joined only by Chief Justice Rehnquist, advocated more broad scale diminishment of *Young.* The two would apply case-by-case balancing, taking into account the availability of a state court forum to resolve the dispute and the importance of the federal right at issue. Concurring Justice O'Connor, joined by Justices Scalia and Thomas, rejected such balancing. *Young* was inapplicable, Justice O'Connor explained, because "it simply cannot be said" that a suit to divest the state of all regulatory power over submerged lands "is not a suit against the State."[159]

Addressing a suit by an independent state agency against state health officials, the Court, quoting *Pennhurst*, reiterated "that the general criterion for determining when a suit is in fact against the sovereign is the effect of the relief sought."[160]

The agency sought access to records of state-run hospitals in federal court. Six Justices upheld the effort: The relief sought was straightforward and prospective, and not a burdensome encroachment on state sovereignty.[161]

Thus, as with the cases dealing with suits facially against the states themselves, the Court's greater attention to state immunity in the context of suits against state officials has resulted in a mixed picture, of some new restrictions, of the lessening of others. But a number of Justices have increasingly resorted to the Eleventh Amendment as a means to reduce federal-state judicial conflict.[162] One may, therefore, expect this to be a continuingly contentious area.

***Tort Actions Against State Officials.***—In *Tindal v. Wesley*,[163] the Court adopted the rule of *United States v. Lee*,[164] a tort suit against federal officials, to permit a tort action against state officials to recover real property

held by them and claimed by the state and to obtain damages for the period of withholding. The immunity of a state from suit has long been held not to extend to actions against state officials for damages arising out of willful and negligent disregard of state laws.[165] The reach of the rule is evident in *Scheuer v. Rhodes*,[166] in which the Court held that plaintiffs were not barred by the Eleventh Amendment or other immunity doctrines from suing the governor and other officials of a state alleging that they deprived plaintiffs of federal rights under color of state law and seeking damages, when it was clear that plaintiffs were seeking to impose individual and personal liability on the officials. There was no "executive immunity" from suit, the Court held; rather, the immunity of state officials is qualified and varies according to the scope of discretion and responsibilities of the particular office and the circumstances existing at the time the challenged action was taken.[167]

# EXHIBITS

John Bellocchio
RENEW OUR CHURCH
PO Box 99
Oakland, New Jersey 07436

The Hon. Maggie Toulouse-Oliver
New Mexico Secretary of State
325 Don Gaspar, Suite 300
Santa Fe, New Mexico 87501

Dear Madame Secretary:

I would like to draw your attention to the enclosed:

1. A letter from the NMOAG referring my query to you.

2. A copy of the certificates of good standing for the Servants of the Paraclete registered with your Office.

3. A concise history of the Servants of the Paraclete written by the renowned Catholic historian, whistleblower, and former priest, Thomas Doyle.

4. Highlighted copies of the New Mexico Statutes currently being violated by the Servants of the Paraclete that demand that you act right now and revoke their certificates of good standing. The sections of the law that have been highlighted are what we know the Servants of the Paraclete are in violation of — we can prove this. The terrifying thought is how much more there is behind this group that we don't know.

1

I write to you with great concern, **and a clear demand for action**. Madame Secretary, the Servants of the Paraclete are a fencing operation for pedophile priests masquerading as a Charity. Your Office must investigate, and your Office must stop giving them legitimacy. Your designation of them as a registered charity is a serious problem as it legitimizes a criminal organization. Rather than take your time here in this letter, a quick review of the enclosed materials will make that clear.

I am a victim of clerical sexual abuse; my abuser was the former Cardinal Theodore McCarrick. Last summer, I had received a tip that my abuser was hiding at the Servants of the Paraclete facility in Missouri. I called officials in Missouri and told them – and they referred me to New Mexico, stating that New Mexico considered them a viable charitable organization. Instead, I brought a gaggle of reporters and FBI agents with me – the day I arrived is the day that McCarrick was seized and extradited to Massachusetts for trial.

Madame Secretary, I have lived through the abject horror of child rape. **I cannot, will not stand idly by while priests who are guests of the Servants of the Paraclete, registered in and**

2

given credence by New Mexico, endanger other children. I have visited all of their facilities, and I will tell you plainly that some of the most dangerous pedophile priests in the country are free to come and go as they please. Three of their facilities have elementary schools in view of the facility itself. This cannot go unaddressed.

I am asking you to do the following:

1. Have an investigator from your Office contact me.
2. I will provide that individual with all of the information I have on the Servants of the Paraclete - it is quite an extensive document collection.
3. Commit to working with me on behalf of thousands of victims to ensure that the Servants of the Paraclete, a criminal organization, does not remain a registered charity in good standing in New Mexico.
4. Do what must be done to shut down their illicit operation, which is sullying your good office and the State of New Mexico's reputation the nation over.

Madame Secretary, under no circumstances will I allow this issue to fade away - I will wage this campaign for justice in public and in courts of law. If the State of New Mexico does not

3

sanction the Servants of the Paraclete, I will utilize every legal means available to ensure that the State of New Mexico and your office are sanctioned instead.  Silence is complicity, and a good and civil society will not allow that to stand.

I may be contacted at 201.914.8268 or 504.977.9181 and also by email at bellocchio1@outlook.com

Having waited years for justice, I look forward to a prompt reply.

Very truly yours,

John Bellocchio

4

HOME

# Search Information

🏠 Home

## Entity Details

| | |
|---|---|
| Business ID#: **252072** | Status: **Active** |
| Entity Name: **THE SERVANTS OF THE PARACLETE** | Standing: **Good Standing** |
| DBA Name: **Not Applicable** | |

## Entity Type and State of Domicile

| | |
|---|---|
| Entity Type: **Domestic Nonprofit Corporation** | State of Incorporation: **New Mexico** |
| Benefit Corporation: **No** | Statute Law Code: **53-8-1 to 53-8-99** |

## Formation Dates

## Reporting Information

## Period of Existence and Purpose and Character of Affairs

## Outstanding Items

**Reports:**

| Fiscal year End Date | Report Due Date | Extended Report Due Date | Reporting Year | Filing Fee | Penalty | Total |
|---|---|---|---|---|---|---|
| 12/31/2022 | 05/15/2023 | | 2022 | $10 | $0 | $10 |

Total No. of Records: 1 Page 1 of 1

**Registered Agent:**

No Records Found.

**License:**

No Records Found.

## Contact Information

| | |
|---|---|
| Mailing Address: | **18161 Hwy. 4, Jemez Springs, NM 87025** |
| Principal Place of Business in New Mexico: | **18161 Hwy 4, Jemez Springs, NM 87025** |
| Secondary Principal Place of | |

Business in New Mexico

| | |
|---|---|
| Principal Office Outside of New Mexico: | **Not Applicable** |
| Registered Office in State of Incorporation: | |
| Principal Place of Business in Domestic State/ Country: | **Not Applicable** |
| Principal Office Location in NM: | **Not Applicable** |

## Registered Agent Information

| | |
|---|---|
| Name: | **Raffaele Talmelli** |
| Geographical Location Address: | |

| | | | |
|---|---|---|---|
| Physical Address: | **18161 Hwy 4, Jemez Springs, NM 87025** | Mailing Address: | **18161 Hwy 4, Jemez Springs, NM 87025** |
| Date of Appointment: | **06/01/2022** | Effective Date of Resignation: | |

## Director Information

| Title | Name | Address |
|---|---|---|
| Director | John Paul Pellietier | 18161 Hwy 4, Jemez Springs, NM 87025 |
| Director | Ba Xuan Dang | 18161 Hwy 4, Jemez Springs, NM 87025 |
| Director | Gerald Scollon | 18161 Hwy 4, Jemez Springs, NM 87025 |
| Director | Douglas Livingstone | 18161 Hwy 4, Jemez Springs, NM 87025 |

## Officer Information

| Title | Name | Address |
|---|---|---|
| President | David T. Fitzgerald | 18161 Hwy 4, Jemez Springs, NM 87025 |
| Chief Executive Officer | David T. Fitzgerald | 18161 Hwy 4, Jemez Springs, NM 87025 |

## Organizer Information

Not Applicable

## Incorporator Information

No Records to View.

**Trustee Information**

**Not Applicable**

**Filing History**

**License History**

[ Back ] [ Entity Name History ] [ Return to Search ]



# NEW MEXICO STATE ETHICS COMMISSION

Hon. William F. Lang (Chair)
Jeff Baker
Stuart M. Bluestone
Hon. Garrey Carruthers
Hon. Celia Foy Castillo
Ron Solimon
Dr. Judy Villanueva

800 Bradbury Dr. SE, Suite 215, Albuquerque, New Mexico 87106
505-827-7800 | ethics.commission@state.nm.us

## COMPLAINT FORM

By my signature below, I verify that the allegations contained in this complaint, along with the attachments and exhibits hereto, are true and correct to the best of my knowledge and belief, and that I believe the allegations herein violate New Mexico election and/or ethics law.

### COMPLAINANT'S INFORMATION (Person(s) and/or Organization(s) filling out this complaint)

Name or Organization: John Bellocchio

Address: PO Box 99

City: Oakland          State: New Jersey          Zip: 07436

Phone: 2019148268          Email: bellocchioj@outlook.com

### RESPONDENT'S INFORMATION (Person(s) and/or Organization(s) this complaint is filed against)

*Include information for additional respondents (if any) on a separate sheet. Complaints submitted without the Respondent's address or email will not be accepted.*

Name or Organization: Maggie Toulouse-Oliver

Address: 325 Don Gaspar, Suite 300

City: Santa Fe          State: New Mexico          Zip: 87501

Phone:          Email:

Have you submitted or will you submit this or a substantially similar complaint against the Respondent with another governmental agency:
☐ Yes ☑ No  If Yes, which agency: _____

Is there any pending legal action against the Respondent for the conduct alleged in the complaint?
☐ Yes ☑ No ☐ Unsure

The State Ethics Commission has jurisdiction to investigate and adjudicate alleged violations of the following statutes. Please indicate the law(s) you believe have been violated and, if known, include specific provisions in the Complaint Description. *(Check all that apply)*:

☐ Campaign Reporting Act
☐ Financial Disclosure Act
☐ Gift Act
☐ Lobbyist Regulation Act
☐ Voter Action Act
☑ Governmental Conduct Act

☐ Procurement Code
☐ State Ethics Commission Act
☐ Article 9, Section 14 of the Constitution of New Mexico (Anti-Donation Clause)
☐ Unsure

Do you believe any of the conduct alleged in this complaint constitutes a violation of criminal law?
☑ Yes ☐ No ☐ Unsure

Attached hereto are _____ additional pages which reasonably describe the actions or inactions which I believe violate the selected laws as indicated above.

**COMPLAINT DESCRIPTION**

Please use the following format for your description of each alleged violation: 1) Law violated; 2) Relevant section(s) or provision(s) of the law: 3) Description of alleged violation; and 4) List of facts that substantiate your allegations; 5) Names and contact information of any witnesses; 6) What action(s) on part of the Respondent will resolve your concern; and 7) Description of supporting documents included with this complaint or documents relevant to the complaint, if any. Please include the date, place, and time of conduct (to the best of your knowledge) for each violation alleged.

New Mexico Secretary of State Maggie Toulouse-Oliver has been informed on several occasions, in writing and through other means of correspondence, that her office has given non-profit charter status - thus legalized status - to a criminal enterprise masquerading as a religious charity. The organization is located in Jemez Springs, Sandoval County, New Mexico. The organization has as its sole mission and purpose the following objective: to hide convicted pedophile priests from criminal and civil justice. As a result of the organizations "official" status in New Mexico, they have been able to use interstate reciprocity to register in other states. This organization has imperiled the lives of thousands of children in New Mexico and across the United States. They are able to do this solely because Secretary Toulouse-Oliver and her Office have continued to give this organization official status despite the numerous warnings - along with significant evidence - that the organization is nothing more than a criminal enterprise. The Government Conduct Act clearly states, "A...public officer's or employee's government position as held as a public trust, and they shall use the powers and resources of public office only to advance the public interest and not to...allow interests incompatible with the public interest to occur. Legislators, public officers, and employees shall conduct themselves in a manner that justifies the confidence placed in them by the people, at all times maintaining the integrity and discharging ethically the high responsibilities of public service." Secretary Toulouse-Oliver has done exactly the opposite of what the Act requires. Because of her failure to act - as mandated by law - a criminal enterprise masquerading as a religious charity is allowed to hide convicted pedophiles all across the United States, including New Mexico. The Secretary has violated the requirement of the ethical discharge of her duties, which would require her to investigate the organization and strip them of their protected status in New Mexico.

By submitting this complaint, I attest under oath and subject to penalty of perjury that the information in the complaint, and any attachments provided with the complaint, are true and accurate.

3/2/2023   John Bellocchio

AN ACT

RELATING TO ETHICS; AMENDING AND ENACTING SECTIONS OF THE
GOVERNMENTAL CONDUCT ACT; PROHIBITING CERTAIN ACTS BY PUBLIC
OFFICERS AND EMPLOYEES; PROHIBITING CERTAIN CONTRACTS.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF NEW MEXICO:

Section 1.  Section 10-16-2 NMSA 1978 (being Laws 1967,
Chapter 306, Section 2, as amended) is amended to read:

"10-16-2.  DEFINITIONS.--As used in the Governmental
Conduct Act:

A.  "business" means a corporation, partnership,
sole proprietorship, firm, organization or individual carrying
on a business;

B.  "confidential information" means information
that by law or practice is not available to the public;

C.  "employment" means rendering of services for
compensation in the form of salary as an employee;

D.  "family" means an individual's spouse, parents,
children or siblings, by consanguinity or affinity;

E.  "financial interest" means an interest held by
an individual or the individual's family that is:

(1)  an ownership interest in business; or

(2)  any employment or prospective employment
for which negotiations have already begun;

F.  "official act" means an official decision,

HB 823
Page 1

recommendation, approval, disapproval or other action that involves the use of discretionary authority;

G. "public officer or employee" means any person who has been elected to, appointed to or hired for any state office and who receives compensation in the form of salary or is eligible for per diem or mileage but excludes legislators;

H. "standards" means the conduct required by the Governmental Conduct Act;

I. "state agency" means any branch, agency, instrumentality or institution of the state; and

J. "substantial interest" means an ownership interest that is greater than twenty percent."

Section 2.  Section 10-16-3 NMSA 1978 (being Laws 1993, Chapter 46, Section 28) is amended to read:

"10-16-3.  ETHICAL PRINCIPLES OF PUBLIC SERVICE--CERTAIN OFFICIAL ACTS PROHIBITED--PENALTY.--

A.  A legislator, public officer or employee shall treat the legislator's, public officer's or employee's government position as a public trust.  The legislator, public officer or employee shall use the powers and resources of public office only to advance the public interest and not to obtain personal benefits or pursue private interests incompatible with the public interest.

B.  Legislators, public officers and employees shall conduct themselves in a manner that justifies the

HB 823
Page 2

confidence placed in them by the people, at all times
maintaining the integrity and discharging ethically the high
responsibilities of public service.

C.  Full disclosure of real or potential conflicts
of interest shall be a guiding principle for determining
appropriate conduct.  At all times, reasonable efforts shall
be made to avoid undue influence and abuse of office in public
service.

D.  No legislator, public officer or employee may
request or receive, and no person may offer a legislator,
public officer or employee, any money, thing of value or
promise thereof that is conditioned upon or given in exchange
for promised performance of an official act.  Any person who
knowingly and willfully violates the provisions of this
subsection is guilty of a fourth degree felony and shall be
sentenced pursuant to the provisions of Section 31-18-15 NMSA
1978."

Section 3.  Section 10-16-4 NMSA 1978 (being Laws 1967,
Chapter 306, Section 4, as amended) is amended to read:

"10-16-4.  OFFICIAL ACT FOR PERSONAL FINANCIAL INTEREST
PROHIBITED--DISQUALIFICATION FROM OFFICIAL ACT--PROVIDING A
PENALTY.--

A.  It is unlawful for a public officer or employee
to take an official act for the primary purpose of directly
enhancing the public officer's or employee's financial

HB 823
Page 3

interest or financial position.  Any person who knowingly and willfully violates the provisions of this subsection is guilty of a fourth degree felony and shall be sentenced pursuant to the provisions of Section 31-18-15 NMSA 1978.

    B.  A public officer or employee shall be disqualified from engaging in any official act directly affecting the public officer's or employee's financial interest."

Section 4.  Section 10-16-6 NMSA 1978 (being Laws 1967, Chapter 306, Section 6, as amended) is amended to read:

"10-16-6.  CONFIDENTIAL INFORMATION.--No legislator, public officer or employee shall use or disclose confidential information acquired by virtue of the legislator's, public officer's or employee's state employment or office for the legislator's, public officer's, employee's or another's private gain."

Section 5.  Section 10-16-7 NMSA 1978 (being Laws 1967, Chapter 306, Section 7, as amended) is amended to read:

"10-16-7.  CONTRACTS INVOLVING PUBLIC OFFICERS OR EMPLOYEES.--A state agency shall not enter into a contract for services, construction or items of tangible personal property with a public officer or employee of the state, with the family of the public officer or employee or with a business in which the public officer or employee or the family of the public officer or employee has a substantial interest unless

HB 823
Page 4

the public officer or employee has disclosed the public officer's or employee's substantial interest and unless the contract is awarded pursuant to the Procurement Code, except that the potential contractor shall not be eligible for a sole source or small purchase contract; provided that this section does not apply to a contract of official employment with the state or to contracts made pursuant to the provisions of the University Research Park Act. A person negotiating or executing a contract on behalf of a state agency shall exercise due diligence to ensure compliance with the provisions of this section."

Section 6. Section 10-16-9 NMSA 1978 (being Laws 1967, Chapter 306, Section 9, as amended) is amended to read:

"10-16-9. CONTRACTS INVOLVING LEGISLATORS-- REPRESENTATION BEFORE STATE AGENCIES.--

A. A state agency shall not enter into a contract for services, construction or items of tangible personal property with a legislator, the legislator's family or with a business in which the legislator or the legislator's family has a substantial interest unless the legislator has disclosed the legislator's substantial interest and unless the contract is awarded in accordance with the provisions of the Procurement Code, except the potential contractor shall not be eligible for a sole source or small purchase contract. A person negotiating or executing a contract on behalf of a

HB 823
Page 5

state agency shall exercise due diligence to ensure compliance with the provisions of this subsection.

B.   A legislator shall not appear for, represent or assist another person in a matter before a state agency, unless without compensation or for the benefit of a constituent, except for legislators who are attorneys or other professional persons engaged in the conduct of their professions and, in those instances, the legislator shall refrain from references to the legislator's legislative capacity except as to matters of scheduling, from communications on legislative stationery and from threats or implications relating to legislative actions."

Section 7.   Section 10-16-13 NMSA 1978 (being Laws 1967, Chapter 306, Section 13) is amended to read:

"10-16-13.   PROHIBITED BIDDING.--No state agency or political subdivision of the state shall accept a bid or proposal from a person who directly participated in the preparation of specifications, qualifications or evaluation criteria on which the specific competitive bid or proposal was based.   A person accepting a bid or proposal on behalf of a state agency or political subdivision of this state shall exercise due diligence to ensure compliance with this section."

Section 8.   A new section of the Governmental Conduct Act is enacted to read:

HB 823
Page 6

"CERTAIN BUSINESS SALES TO STATE AGENCIES AND THEIR
EMPLOYEES PROHIBITED.--

A.   A public officer or employee shall not sell or
be a party to a transaction to sell goods, services,
construction or items of tangible personal property directly
or indirectly, through the public officer's or employee's
family or a business in which the public officer or employee
has a substantial interest, to the state agency with which the
public officer or employee is employed.  It is not a violation
of this subsection if the public officer or employee employed
by the state agency in good faith is not aware of:

(1)  the substantial interest held by the
public officer or employee or the public officer's or
employee's family in the business that is selling or engaged
in a transaction to sell goods, services, construction or
items of tangible personal property to the state agency by
which the public officer or employee is employed; or

(2)  the sale of or the transaction to sell
goods, services, construction or items of tangible personal
property by the public officer's or employee's family or by a
business in which the public officer or employee or the public
officer's or employee's family has a substantial interest to
the state agency by which the public officer or employee is
employed.

B.   A public officer or employee shall not sell,

HB 823
Page 7

offer to sell, coerce the sale of or be a party to a transaction to sell goods, services, construction or items of tangible personal property, directly or indirectly through the public officer's or employee's family or a business in which the public officer or employee has a substantial interest, to an employee supervised by the public officer or employee. A public officer or employee shall not receive a commission or shall not profit from the sale or a transaction to sell goods, services, construction or items of tangible personal property to an employee supervised by the public officer or employee. The provisions of this subsection shall not apply if the supervised employee initiates the sale. It is not a violation of this subsection if a public officer or employee, in good faith, is not aware that the employee to whom the goods, services, construction or items of tangible personal property are being sold is under the supervision of the public officer or employee.

C. A public officer or employee shall not sell, offer to sell, coerce the sale of or be a party to a transaction to sell goods, services, construction or items of tangible personal property, directly or indirectly through the public officer's or employee's family or a business in which the public officer or employee has a substantial interest, to a person over whom the public officer or employee has regulatory authority.

HB 823
Page 8

D.  A public officer or employee shall not receive a commission or shall not profit from the sale or a transaction to sell goods, services, construction or items of tangible personal property to a person over whom the public officer or employee has regulatory authority.

E.  A public officer or employee shall not accept from a person over whom the public officer or employee has regulatory authority an offer of employment or an offer of a contract in which the public officer or employee provides goods, services, construction, items of tangible personal property or other things of value to the person over whom the public officer or employee has regulatory authority."

Section 9.  A new section of the Governmental Conduct Act is enacted to read:

"PROHIBITED POLITICAL ACTIVITIES.--Public officers and employees are prohibited from:

A.  directly or indirectly coercing or attempting to coerce a state officer or employee to pay, lend or contribute anything of value to a party, committee, organization, agency or person for a political purpose;

B.  threatening to deny a promotion or pay increase to an employee who does or does not vote for certain candidates, requiring an employee to contribute a percentage of the employee's pay to a political fund, influencing a subordinate employee to purchase a ticket to a political

HB 823
Page 9

fundraising dinner or similar event, advising an employee to take part in political activity or similar activities; or

C. violating the officer's or employee's duty to not use state property, or allow its use, for other than authorized purposes."

Section 10. A new section of the Governmental Conduct Act is enacted to read:

"DISCLOSURE OF OUTSIDE EMPLOYMENT.--A public officer or employee shall disclose in writing to the supervisor of the officer or employee, or in the event there is no supervisor, to the secretary of state, all employment engaged in by the officer or employee other than the employment with the state."

Section 11. A new section of the Governmental Conduct Act is enacted to read:

"PROHIBITED CONTRIBUTIONS--FINANCIAL SERVICE CONTRACTORS.--

A. A business that contracts with a state agency to provide financial services involving the investment of public money or issuance of bonds for public projects shall not knowingly contribute anything of value to a public officer or employee of that state agency who has authority over the investment of public money or issuance of bonds, the revenue of which is used for public projects in the state.

B. A public officer or employee of a state agency that has authority over the investment of public money or

HB 823
Page 10

issuance of bonds, the revenue of which is used for public projects in the state, shall not knowingly accept a contribution of anything of value from a business that contracts with that state agency to provide financial services involving the investment of public money or issuance of bonds for public projects.

C. For the purposes of this section:

(1) "anything of value" means any money, property, service, loan or promise, but does not include food and refreshments with a value of less than one hundred dollars ($100) consumed in a day; and

(2) "contribution" means a donation or transfer to a recipient for the personal use of the recipient, without commensurate consideration."

Section 12. EFFECTIVE DATE.--The effective date of the provisions of this act is July 1, 2007.

HB 823
Page 11



800 Bradbury Dr. SE
Suite 215
Albuquerque, NM 87106
(505) 827 7800
www.sec.nm.gov

Hon. William F. Lang (*Chair*)
Jeffrey L. Baker
Stuart M. Bluestone
Hon. Celia Foy Castillo
Hon. Garrey Carruthers
Ronald Solimon
Judy Villanueva

# STATE ETHICS COMMISSION

**March 13, 2023**

**COMPLAINT FILED ON:**
**03/02/2023**

**Via Proceedings Portal**
John Bellocchio
PO Box 99
Oakland, NJ, 07436
201 914 8268
bellocchioj@outlook.com
    *Complainant*

Re: *Bellocchio v. Toulouse Oliver*, Case No. 2023-007

## NOTICE OF COMPLAINT RECEIVED

Dear Mr. Bellocchio,

The State Ethics Commission has received your complaint against New Mexico Secretary of State Maggie Toulouse Oliver ("Respondent"). The Commission has assigned your complaint the number 2023-007. The Commission will notify the Respondent of the filing of the complaint and provide the Respondent with a copy of the complaint within seven days of the date the complaint was filed. *See* 1.8.3.10(A) NMAC.

### 1. General Information

The Commission encourages you to review the State Ethics Commission Act, NMSA 1978, Sections 10-16G-1 through 10-16G-16, and the rules of procedure for administrative complaints and hearings, Section 1.8.3 NMAC. These materials, along with other explanatory guidance for parties appearing before the SEC, are available on the SEC's website at www.sec.nm.gov. Below is a brief overview.

The Executive Director or his designee first reviews the complaint to determine whether the Commission has jurisdiction. The Respondent may file an answer to the complaint. You will receive a copy of any responsive pleading that the Respondent files.

If the Commission has jurisdiction, the Executive Director or his designee will forward the complaint to the General Counsel, who will then investigate whether the Complaint's allegations are frivolous or unsubstantiated or, in the alternative, are supported by probable cause. If the General Counsel concludes that the complaint is supported by probable cause, a public hearing will be set. You will receive notice of any action taken on the complaint.

At this time, the State Ethics Commission and its staff must treat the complaint as confidential under NMSA 1978, Section 10-16G-13(C). Note, however, that neither you nor the Respondent is prohibited from releasing the complaint or speaking publicly about it.

Until the Commission issues a final decision on your complaint, both you and the Respondent are prohibited from contacting any hearing officer, Commissioner, or other person involved in a determination of the complaint. Please also be aware that the State Ethics Commission Act prohibits taking or threating to take retaliatory, disciplinary, or other adverse action against anyone who in good faith files a verified complaint with the Commission or provides testimony or other information to the Commission.

Under the Commission's rules, you are permitted to represent yourself or be represented by a licensed attorney. For more information about the Commission's complaint and hearing process, please visit the Commission's website at www.sec.nm.gov.

### 2. How to file documents with the Commission

To file any papers required under the Commission's rules of procedure 1.8.3 NMAC, please submit your documents through the State Ethics Commission's Proceedings Portal, by creating an account, at https://proceedings.sec.state.nm.us/login.html. For more information about the Proceedings Portal, including instructional videos, please visit: https://www.sec.nm.gov/about-portal/.

If you have questions regarding this notice or the Commission's Proceedings Portal, please contact the State Ethics Commission at ethics.commission@sec.nm.gov or 505 554-7706.

Sincerely,

Caroline "KC" Manierre, Special Counsel
Jeremy Farris, Executive Director
State Ethics Commission

cc:   Walker Boyd, General Counsel, State Ethics Commission (via email:
      walker.boyd@sec.nm.gov)

2



800 Bradbury Dr. SE
Suite 215
Albuquerque, NM 87106
(505) 827 7800
www.sec.nm.gov

Hon. William F. Lang (*Chair*)
Jeffrey L. Baker
Stuart M. Bluestone
Hon. Celia Foy Castillo
Hon. Garrey Carruthers
Ronald Solimon
Judy Villanueva

# STATE ETHICS COMMISSION

**March 13, 2023**

**COMPLAINT FILED ON:
03/02/2023**

**Via Electronic Mail and Proceedings Portal**
Maggie Toulouse Oliver
New Mexico Capitol Annex North
325 Don Gaspar, Suite 300
Santa Fe, NM 87501
Maggie.TOliver@sos.nm.gov

*Respondent*

Re: *Bellocchio v. Toulouse Oliver*, Case No. 2023-007

## NOTICE

Dear Secretary Toulouse Oliver,

This letter serves as notice that a complaint naming Secretary of State Maggie Toulouse Oliver ("Respondent") as a respondent has been filed with the New Mexico State Ethics Commission ("SEC" or "Commission"). A copy of the complaint is included with this notice. *See* Attachment 1, Compl., *Bellocchio v. Toulouse Oliver*, Case No. 2023-007 (Mar 02, 2023).

### 1. The State Ethics Commission has jurisdiction for the complaint filed against you.

The complaint alleges you violated the Governmental Conduct Act, Section 10-16-3, by failing to act as required by law in your discharge of duties as Secretary of State. The Commission may enforce the civil compliance provisions of the Governmental Conduct Act, and you are a "public official" under the terms of the State Ethics Commission Act. *See* NMSA 1978, §§ 10-16G-2(L), 10-16G-9(A). The Commission therefore has jurisdiction over the complaint.

Accordingly, I am providing you with: (i) this notice required under NMSA 1978, Subsection 10-16G-10(C) and 1.8.3.10(C) NMAC; and (ii) a copy of the complaint. You may file a response to the complaint within 15 days of the date of this notification and serve the same upon the complainant. *See* NMSA 1978, § 10-16G-10(C); 1.8.3.10(C)(2) NMAC. Your response may answer the complaint's assertion of facts and present arguments that the complaint is frivolous, unsubstantiated or not supported by probable cause. *See* 1.8.3.10(C)(3) NMAC.

In what follows, I will provide you with additional, general information about the Commission's procedure in administrative cases.

2.    **General information about State Ethics Commission administrative proceedings**

Because the Commission has jurisdiction for this complaint, I am forwarding the complaint to the Commission's General Counsel, who will review any response you file and investigate whether the complaint's allegations are frivolous or unsubstantiated or, in the alternative, are supported by probable cause. *See* NMSA 1978, § 10-16G-10(E); 1.8.3.10(C)(3) NMAC. Accordingly, please preserve documents or other information that may be relevant to the General Counsel's investigation.

After reviewing the complaint, the response, and conducting any investigation, if the General Counsel concludes that the complaint is supported by probable cause, a public hearing will be set. Please be aware that the Commission has the statutorily granted power to enforce the laws under its jurisdiction. Both parties to this proceeding will receive notice of any action taken on the complaint.

Note that if you do not respond to the complaint by filing a response, the General Counsel is nonetheless under a statutory duty to commence an investigation. The General Counsel's investigation might continue until such time as you voluntarily participate or are subpoenaed pursuant to NMSA 1978, Section 10-16G-10(J) and 1.8.3.11-12 NMAC.

The Commission encourages you to review the State Ethics Commission Act, NMSA 1978, Sections 10-16G-1 through 10-16G-16, and the rules of procedure for administrative complaints and hearings that the Commission has issued, 1.8.3 NMAC. These materials, along with other explanatory guidance for parties appearing before the Commission, are available on the Commission's website at www.sec.nm.gov and www.srca.nm.gov/nmac-home.

Please note that you may represent yourself or be represented by a licensed attorney in Commission proceedings. **If you are a state public official or a state employee, you might be entitled to representation provided by the Risk Management Division of the General Services Department, which you may contact at (505) 827 2036.** Please also note that, at any time, the General Counsel may enter into a proposed settlement agreement with you. *See* NMSA 1978, §10-16G-10(F); 1.8.3.13(C) NMAC.

Until the Commission issues a final decision on your complaint, you and the complainant are prohibited from contacting any hearing officer, Commissioner, or other person involved in a determination of the complaint. *See* NMSA 1978, § 10-16G-16(B). This means that you should principally communicate with the Commission or a hearing officer through filings allowed under statute and rule.

At this time, the State Ethics Commission and its staff must treat the complaint as confidential under NMSA 1978, Section 10-16G-13(C). Note, however, that neither you nor the complainant is prohibited from releasing the complaint or speaking about it publicly.

Please also be aware that the State Ethics Commission Act prohibits taking or threatening to take retaliatory, disciplinary, or other adverse action against anyone who in good faith files a verified complaint with the Commission or provides testimony or other information to the Commission. *See* NMSA 1978, § 10-16G-16(A).

### 3.    How to file documents with the Commission

To file a response, as well as to receive updates regarding the status of your case, please create an account with the State Ethics Commission's Proceedings Portal at: https://proceedings.sec.state.nm.us/login.html. If you are represented by counsel, your attorney should create an account as well. **Once you or your attorney creates an account and requests access to your case via the Proceedings Portal or email to ethics.commission@sec.nm.gov, you will be able to file documents in this case.** For more information about the Proceedings Portal, including instructional videos, please visit: https://www.sec.nm.gov/about-portal/.

If you have questions regarding this notice, the State Ethics Commission's Proceedings Portal, or the procedures for submitting a responsive pleading or motion, please contact the Commission at (505) 554-7706.

Sincerely,

Caroline "KC" Manierre, Special Counsel
Jeremy Farris, Executive Director
State Ethics Commission

(Enclosures)

cc:    Walker Boyd, General Counsel, State Ethics Commission (via email: walker.boyd@sec.nm.gov)

3



**STATE OF NEW MEXICO**
OFFICE OF THE ATTORNEY GENERAL

**RAÚL TORREZ**
**ATTORNEY GENERAL**

January 9, 2023

**_Via Electronic Mail Only_**
John V. Bellocchio
Email: bellocchioj@outlook.com

RE: NMOAG-ECS-20221109-6363

Dear Mr. Bellocchio,

The New Mexico Office of the Attorney General is in receipt of your electronically submitted complaint as well as your email regarding the Servants of the Paraclete. We thank you for voicing your opinion and sharing your concerns. Please note, while charitable organizations are required to register with the NMOAG pursuant to Charitable Solicitations Act, religious organizations are exempt under the Act.

After review of your complaint, we have determined that the appropriate agencies to review this matter are the New Mexico Secretary of State and the Internal Revenue Service. I have provided their contact information below for your convenience.

New Mexico Internal Revenue Service
6200 Jefferson St. NE
Albuquerque, NM 87109
(844) 545-5640
https://www.irs.gov/charities-and-nonprofits

New Mexico Secretary of State
325 Don Gaspar, Suite 300
Santa Fe, NM 87501
(505) 827-3600
https://www.sos.state.nm.us/contact-us/

We regret that we are unable to provide you with any further assistance with this matter. Thank you for contacting the New Mexico Office of the Attorney General.

Sincerely,

Novela Salazar

Director
Advocacy and Intervention Division
New Mexico Office of the Attorney General

Enclosure: As Referenced Above

cc: File # NMOAG-ECS-20221109-6363

## RE: [EXTERNAL] Re: Servants of the Paraclete Case

**Apodaca, Alexander, DPS <Alexander.Apodaca@dps.nm.gov>**

Mon 1/23/2023 5:23 PM

To: John Bellocchio <bellocchioj@outlook.com>

Hello Sir,
I have attempted to contact the AG's office multiple times at this point and have had no success at reaching the civil department. My recommendation is to reach out to their main line or by email specifically through the charities complaint section. We will be closing our criminal case.


Respectfully,
New Mexico State Police Agent Alexander Apodaca
2501 Carlisle Blvd. NE
Albuquerque, NM 87110
Work Phone: 505-841-9256
Fax: 505-841-9249



**From:** John Bellocchio <bellocchioj@outlook.com>
**Sent:** Thursday, January 5, 2023 9:49 AM
**To:** Apodaca, Alexander, DPS <Alexander.Apodaca@dps.nm.gov>
**Subject:** Re: [EXTERNAL] Re: Servants of the Paraclete Case


Got it, thanks - 12:45 PM my time then.

**From:** Apodaca, Alexander, DPS <Alexander.Apodaca@dps.nm.gov>
**Sent:** Thursday, January 5, 2023 11:47 AM
**To:** John Bellocchio <bellocchioj@outlook.com>
**Subject:** RE: [EXTERNAL] Re: Servants of the Paraclete Case


Good Morning,
I will call you at 10:45 AM.

Respectfully,
New Mexico State Police Agent Alexander Apodaca
2501 Carlisle Blvd. NE
Albuquerque, NM 87110
Work Phone: 505-841-9256
Fax: 505-841-9249



**From:** John Bellocchio <bellocchioj@outlook.com>
**Sent:** Thursday, January 5, 2023 9:46 AM
**To:** Apodaca, Alexander, DPS <Alexander.Apodaca@dps.nm.gov>
**Subject:** [EXTERNAL] Re: Servants of the Paraclete Case

---

CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.

---

Good morning - I have been trying to reach you. Please advise of a good time to call.

---

**From:** Apodaca, Alexander, DPS <Alexander.Apodaca@dps.nm.gov>
**Sent:** Wednesday, January 4, 2023 5:13 PM
**To:** bellocchioj@outlook.com <bellocchioj@outlook.com>
**Subject:** Servants of the Paraclete Case

Good Afternoon,
I have been assigned to look over the servants of the paraclete case. If you have some time available, I would like to speak with you about the case. Please provide your phone number so I can contact you.

Respectfully,
New Mexico State Police Agent Alexander Apodaca
2501 Carlisle Blvd. NE
Albuquerque, NM 87110
Work Phone: 505-841-9256
Fax: 505-841-9249



*Omnia Pro Christo Sacerdote*

*Phone Jemez Springs Number 5*

# Via Coeli   MONASTERY OF THE SERVANTS OF THE PARACLETE

OFFICE OF THE SERVANT GENERAL

Jemez Springs, New Mexico

July 4, 1956

Reverend and dear Fathers:

    I wish at this time when we have so many reasons to thank God to address to you the following words of information, instruction, counsel and commendation.

    Today as we celebrate the independence of our great nation through the gracious and Christlike understanding and wise counsel of our ecclesiastical superior and co-founder His Excellency Archbishop Byrne we have been enabled to give final profession to Father Patrick Halligan of Our Mother of Perpetual Help and whom we have nominated to be Master of Novices in our Community and on the same occasion we had the happiness of professing Father Agnellus of the Sacred Heart whom you all know and love. Father Agnellus' profession is final because he is transferring by canonical rescript from solemn vows in the Franciscan Order. These professions bring to a total of 24 the number of professed Paracletes and 5 Oblates which surely in the brief years of our existence is a consoling indication of God's merciful designs in our regard. We have besides 6 priests and 3 seminarians in the novitiate and a saintly priest on retreat prior to entering the novitiate, and at least one other expected. We have in our retreat houses very close to 100 guests and as of this date, July 4, we have some 10 or 11 Paracletes here and there in the country helping Bishops who are hard pressed for cover. Father Edwin Connolly and Father John Mathias McCarthy have the Villa Madre de Dios community functioning smoothly and efficiently in helping the needs of the Archdiocese of Santa Fe. Here in the Canyon Father Guy Rossi and the Regina Mundi house threatens to surpass the Motherhouse and Voluntas Dei and Father Pat Mulcahy is a small but vigorous planting. Father Felix is doing an outstanding job with the parish in our administration at Two Inlets. I am especially happy over his development of the Eucharistic consciousness of his people. Father Urban with Father Swanson's able assistance has Our Lady of the Snows Retreat at Nevis, Minnesota, developing rapidly. We are grateful to Bishop Schenk for this splendid development. Finally here at the Motherhouse the increased number of final professions makes it possible for us to fill out the offices of the General Administration which at the present moment are: Fr. Francis J. Morrell, Consultor and Vicar General; Fr. Joseph Moylan, Consultor and Treasurer General; Fr. Edward Woeber Consultor and Secretary General; Fr. John D. Lee, Consultor, thus bringing back to the General Administration Father Woeber and adding the experience of one of our oldest Paracletes who is taking care of a difficult assignment-the parish of St. Genevieve at Las Cruces, New Mexico. We wish by the selection of Father Lee to indicate how valuable in the Congregation are the spiritual contributions of those Paracletes who under holy obedience are deprived of the consolations of community life.

**SERVANTS -0360**

---

*Via Coeli is Under the Authority of the Archbishop of Santa Fe*

*Omnia Pro Christo Sacerdote*                                                    *Phone Jemez Springs Number 5*

# Via Coeli    MONASTERY OF THE SERVANTS OF THE PARACLETE

OFFICE OF THE SERVANT GENERAL

Jemez Springs, New Mexico

In conclusion let me beg you, dear Paracletes, to
love the Divine Spirit and learn to live in simple childlike
docility to the Spirit Who gives to our souls the dignity of a
temple of the living God. He will lead you deeper and deeper
into the Sacred Heart and there, and there alone, will you find
the warmth of Divine Caritas without which priestly hearts soon
find themselves fighting the chill of worldliness and earthly
frustration. We are at the beginning of an era of great expansion.
The spiritual structure of our individual souls will measure how
great a temple to the living God our Congregation will bring into
being. I bless you in the Name of the Triune God and ask your
prayers that my personal unworthiness may not thwart the achieve-
ment of God's glory in you.

*Fr. Gerald of the Holy Spirit*

July 4, 1956                                    Servant General


P.S. A financial drive for a building fund for
adequate facilities here in the Canyon is developing. Pray if
it is God's will that it will prosper.

SERVANTS -0361

HOME

# Search Information

🏠Home

## Entity Details

| | | | |
|---|---|---|---|
| Business ID#: | **252072** | Status: | **Active** |
| Entity Name: | **THE SERVANTS OF THE PARACLETE** | Standing: | **Good Standing** |
| DBA Name: | **Not Applicable** | | |

## Entity Type and State of Domicile

| | | | |
|---|---|---|---|
| Entity Type: | **Domestic Nonprofit Corporation** | State of Incorporation: | **New Mexico** |
| Benefit Corporation: | **No** | Statute Law Code: | **53-8-1 to 53-8-99** |

## Formation Dates

## Reporting Information

## Period of Existence and Purpose and Character of Affairs

## Outstanding Items

### Reports:

| Fiscal year End Date | Report Due Date | Extended Report Due Date | Reporting Year | Filing Fee | Penalty | Total |
|---|---|---|---|---|---|---|
| 12/31/2022 | 05/15/2023 | | 2022 | $10 | $0 | $10 |

Total No. of Records: 1 Page 1 of 1

### Registered Agent:

No Records Found.

### License:

No Records Found.

## Contact Information

| | |
|---|---|
| Mailing Address: | **18161 Hwy. 4, Jemez Springs, NM 87025** |
| Principal Place of Business in New Mexico: | **18161 Hwy 4, Jemez Springs, NM 87025** |
| Secondary Principal Place of | |

Business in New Mexico:

| | |
|---|---|
| Principal Office Outside of New Mexico: | **Not Applicable** |
| Registered Office in State of Incorporation: | |
| Principal Place of Business in Domestic State/ Country: | **Not Applicable** |
| Principal Office Location in NM: | **Not Applicable** |

## Registered Agent Information

| | |
|---|---|
| Name: | **Raffaele Talmelli** |
| Geographical Location Address: | |

| | | | |
|---|---|---|---|
| Physical Address: | **18161 Hwy 4, Jemez Springs, NM 87025** | Mailing Address: | **18161 Hwy 4, Jemez Springs, NM 87025** |
| Date of Appointment: | **06/01/2022** | Effective Date of Resignation: | |

## Director Information

| Title | Name | Address |
|---|---|---|
| Director | John Paul Pellietier | 18161 Hwy 4, Jemez Springs, NM 87025 |
| Director | Ba Xuan Dang | 18161 Hwy 4, Jemez Springs, NM 87025 |
| Director | Gerald Scollon | 18161 Hwy 4, Jemez Springs, NM 87025 |
| Director | Douglas Livingstone | 18161 Hwy 4, Jemez Springs, NM 87025 |

## Officer Information

| Title | Name | Address |
|---|---|---|
| President | David T. Fitzgerald | 18161 Hwy 4, Jemez Springs, NM 87025 |
| Chief Executive Officer | David T. Fitzgerald | 18161 Hwy 4, Jemez Springs, NM 87025 |

## Organizer Information

**Not Applicable**

## Incorporator Information

No Records to View.

**Trustee Information**

**Not Applicable**

**Filing History**

**License History**

[ Back ]   [ Entity Name History ]   [ Return to Search ]

HOME

# Search Information

🏠Home

---

## Entity Details

Business ID#: **1445964**                        Status: **Merged**

Entity Name: **SERVANTS OF THE PARACLETE - GENERALATE**          Standing: **N/A**

DBA Name: **Not Applicable**

## Entity Type and State of Domicile

Entity Type: **Domestic Nonprofit Corporation**          State of Incorporation: **New Mexico**

Benefit Corporation: **No**          Statute Law Code: **53-8-1 to 53-8-99**

## Formation Dates

## Reporting Information

## Period of Existence and Purpose and Character of Affairs

---

## Outstanding Items

### Reports:

No Pending Reports.

### Registered Agent:

No Records Found.

### License:

No Records Found.

---

## Contact Information

Mailing Address: **6476 EIME RD, DITTMER, MO 63023**

Principal Place of Business in New Mexico: **15 S LOURDES DR, JEMEZ SPRINGS, NM 87025**

Secondary Principal Place of Business in New Mexico:

Principal Office Outside of New Mexico: **Not Applicable**

Registered Office in State of
Incorporation:

Principal Place of Business in
Domestic State/ Country:   **Not Applicable**

Principal Office Location in NM:   **Not Applicable**

## Registered Agent Information

Name:   **JEFF JONES**

Geographical Location
Address:

Physical Address:   **5 CALIENTE RD BLDG 1 STE C, SANTA FE, NM 87508**     Mailing Address:  **NONE**

Date of Appointment:  **08/03/1989**     Effective Date of Resignation:

## Director Information

| Title | Name | Address |
|---|---|---|
| Director | LIAM HOARE | 6476 EIME ROAD, DITTMER, MO 63023 |
| Director | PHILIP TAYLOR | 6476 EIME ROAD, DITTMER, MO 63023 |
| Director | RICHARD BROWN | 6476 EIME ROAD, DITTMER, MO 63023 |

## Officer Information

| Title | Name | Address |
|---|---|---|
| President | DAVID FITZGERALD | 15 SOUTH LOURDES DRIVE, JEMEZ SPRINGS, NM 87025 |

## Organizer Information

**Not Applicable**

## Incorporator Information

No Records to View.

## Trustee Information

**Not Applicable**

## Filing History



**License History**



[ Back ]   [ Entity Name History ]   [ Return to Search ]

HOME

## Search Information

🏠Home

### Entity Details

Business ID#: **1625755**                Status: **Active**

Entity Name: **SERVANTS OF THE PARACLETE FOUNDATION**     Standing: **Good Standing**

DBA Name: **Not Applicable**

### Entity Type and State of Domicile

Entity Type: **Domestic Nonprofit Corporation**     State of Incorporation: **New Mexico**

Benefit Corporation: **No**              Statute Law Code: **53-8-1 to 53-8-99**

### Formation Dates

### Reporting Information

### Period of Existence and Purpose and Character of Affairs

### Outstanding Items

**Reports:**

| Fiscal year End Date | Report Due Date | Extended Report Due Date | Reporting Year | Filing Fee | Penalty | Total |
|---|---|---|---|---|---|---|
| 12/31/2022 | 05/15/2023 | | 2022 | $10 | $0 | $10 |

Total No. of Records: 1 Page 1 of 1

### Registered Agent:

No Records Found.

### License:

No Records Found.

### Contact Information

Mailing Address: **18161 Hwy 4, Jemez Springs, NM 87025**

Principal Place of Business in New Mexico: **18161 Hwy 4, Jemez Springs, NM 87025**

Secondary Principal Place of

2/3/23, 8:20 PM

Business in New Mexico?

Corporations Division

| | |
|---|---|
| Principal Office Outside of New Mexico: | **Not Applicable** |
| Registered Office in State of Incorporation: | |
| Principal Place of Business in Domestic State/ Country: | **Not Applicable** |
| Principal Office Location in NM: | **Not Applicable** |

## Registered Agent Information

| | |
|---|---|
| Name: | **JEFF JONES** |
| Geographical Location Address: | |
| Physical Address: | **5 CALIENTE RD BLDG 1 STE C, SANTA FE, NM 87508** |
| Mailing Address: | **NONE** |
| Date of Appointment: | **08/17/1993** |
| Effective Date of Resignation: | |

## Director Information

| Title | Name | Address |
|---|---|---|
| Director | Gerald Scollon | 18161 Hwy 4, Jemez Springs, NM 87025 |
| Director | Ba Xuan Dang | 18161 Hwy 4, Jemez Springs, NM 87025 |
| Director | Philip Taylor | 6476 EIME ROAD, Dittmer, MO 63023 |

## Officer Information

| Title | Name | Address |
|---|---|---|
| President | David Thomas Fitzgerald | 18161 Hwy 4, Jemez Springs, NM 87025 |
| Chief Executive Officer | David Thomas Fitzgerald | 18161 Hwy 4, Jemez Springs, NM 87025 |

## Organizer Information

**Not Applicable**

## Incorporator Information

No Records to View.

## Trustee Information

Not Applicable

**Filing History**

**License History**

Back    Entity Name History    Return to Search



OASI EUCARISTICA
SERVI DEL S. PARACLITO
MONTOPOLI SABINA (RIETI) ITALIA

August 27, 1963

Most Holy Father:

Let me begin by thanking Your Holiness from the bottom
of my heart on behalf of myself, Father Edward Woeber our assistant
general and the Servants of the Holy Paraclete for the gracious
audience of August 26. In accordance with Your Holiness' desire
I am summarizing some convictions on the problem of the problem
priest that our forty years in the priesthood and some twenty
years of working exclusively in the Paraclete apostolate to help
priests have crystalized in our soul.

1) I believe the natural qualities and virtues of aspir--
ants to the priesthood should be more carefully observed before they
are segregated and channeled towards the priesthood. To be a good
priest, and only the good priest is the successful priest, the
aspirant must be naturally of a generous and cheerful character.
I am seapking now of the priest whose vocation is the so-called
active vocation. Too many even good men but self-centered reach
the priesthood.

2) On this natural, generous and cheerful temperament
the years of formation should build and develop, side by side, the
head and the heart into a unique partnership for God and with God.
The brilliant priest is a liability rather than an asset to the
Church unless, as in the case of Augustine and Aquinas, there is

OASI EUCARISTICA                                                    2.
SERVI DEL S. PARACLITO
MONTOPOLI SABINA (RIETI) ITALIA

the warmth of a personal love for God and a natural humility that
recognizes that the most brilliant intellect is shining only with
light reflected from the infinity of Divine Truth. Unfortunately
there is an understandable temptation to consider the brilliant
student as adequate for the priesthood without a deep scrutiny of
his interior spirit.

     3) There has been an alarming increase in the present era
of priestly casualties. A neo-paganism has arisen. Christian
modesty is at a low ebb (note Our Lord's comment to the children
of F . . .) and the priest who is walking and working in the midst
of neo-paganism cannot but be affected by his enviornment. A century
ago a parish priest in his rectory and a religious in his monastery
had comparatively much less exposure to the world, the flesh and
the devil. His only means of survival today is a very real and
personal interior life which is equivalently and efftively the life
of constant union with Christ motivated by personal love and sus-
tained by abiding prayer and mortification. When these elements fail
to be present, or to be maintained, the casualties are bound to be
multiplied. The present conditions could have been easily predicted
and are not in themselves surprising.

     4) Having analysed raison d'etre for the increased casual-
ties let us now consider how they should be treated. This calls for

OASI EUCARISTICA
SERVI DEL S. PARACLITO
MONTOPOLI SABINA (RIETI) ITALIA

3.

classification and along two lines:

    a) the length of time the priest in trouble has been in trouble.

    b) classification according to the character of his problem and his own individual character. This last element is the most vital factor in the prediction of his recovery.

    Under the first class, obviously the priest who comes on penitential retreat after long years of habitual sin will need a different treatment, if only in duration, than the priest whose fall is a first fall and who has had the good fortune to be brought up swiftly with the seriousness of his situation. Here we recommend to the Hierarchy the value of an ordered retreat which may well save a priest from becoming hopelessly enmeshed. We have had priests say to us: "Father if I had only come here on retreat a year ago, or two years ago, I would not now be under the grave censure of the Church."

    5) The corrective remedies to be applied and their effectiveness will obviously depend upon the good will and character of the individual. Problems that arise from abnormal, homosexual tendencies are going to call for, not only spiritual, but understanding psychiatric counselling. Personally I am not sanguine of the return of priests to active duty who have been addicted to

OAŠI EUCARISTICA                                                   4.
SERVI DEL S. PARACLITO
MONTOPOLI SABINA (RIETI) ITALIA

abnormal practices, especially sins with the young. However, the

needs of the Church must be taken into consideration and an activa-

tion of priests who have seemingly recovered in this field may be

considered but is only recommended where careful guidance and

supervision is possible. Where there is indication of incorrigi-

bility, because of the tremendous scandal given, I would most

earnestly recommend total laicization. I say "total" designedly

because when these men are taken before civil authority the non-

Catholic world definitely blames the discipline of celibacy for the

perversion of these men. They argue - rightly or wrongly - that

these men turn to boys because they are denied the reight of marriage.

6) As for the priest who has entered civil marriage, or

who has for years lived in concubinage, for the lifting of scandal

and the elimination of the sacrilege arising from living in habitual

sin as, above all, for the salvation of souls which is the Church's

reason for being I believe where there is no other invalidating

impediment these unions should be quietly validated with the final

punitive sanction eliminating any hope of priestly rehabilitation.

7) The fear that this would encourage others doubtlessly

has some weight but is it not true that the Church for centuries has

granted dispensation from the solmen vows of religion - both men

and women - if they insist and yet this had not made a notable

change in the determination of the vast majority of religious to live

SERVANTS_0027

OASI EUCARISTICA
SERVI DEL S. PARACLITO
MONTOPOLI SABINA (RIETI) ITALIA

5.

die within the voluntary renunciation of their vows. Moreover, there must be a realistic recognition of the fact that the average priest who sins with a woman has no intention of abandining his priestly life on a permanent basis and hence is not seeking an out from the priesthood. Moreover, the knowledge that priests were abiding in priestly self-discipline by an abiding personal choice rather than the onus of vindictive law would bring a deeper respect for the priesthood in the long range esteem of the Roman Catholic priesthood before the world.

AUGUST 27, 1963

(Very Rev.) Gerald M.C.Fitzgerald, s.P.
Superior General
Servants of the Holy Paraclete

SERVANTS -0028

September 10, 1964

Most Rev. Joseph A. Durick, D. D.
Collegio Della SS. Trinita
Viale Africa, 33
Rome, Italy, E.U.R.

Most Reverend and dear Bishop:

In the heavy rush of our life here, please pardon the delay in getting the answers off to you.

In the first instance may we say that we have been deeply edified by your personal interest in helping priests who are caught in this particular dilemma. I will try to make my answers brief.

1. I myself in an audience I was privileged to have with His Holiness, Pope Paul, spoke of this matter which undoubtedly has been one of the deep concerns of his fatherly soul. As a matter of fact, we had in mind--where there was no other diriment impediment--a sanatio accomplished in the internal forum and permitting the de facto civil marriage to take over with, however, a permanent life cessation of the exercise of the priesthood.

2. I am certain there is a secret directive to Bishops permitting--under what conditions I know not--something along these lines. I surmise it is so new a development that Bishops have been slow to exercise it.

3. The gravest objection has seemed to stem from the fear of a landslide. But personally--and we here are in a position to know a good deal more than many others on these matters--I am convinced that since it takes greater unselfishness to find abiding happiness in marriage than under the discipline of Holy Orders, that very quickly priests who had taken advantage of the new discipline would say almost universally to others consulting them ante,factum: "In God's name, don't be a fool." It is the selfish man who leaves the priesthood and normally the selfish man is permanently unhappy.

4. May I take this occasion, Your Excellency, to bring to your attention what is a growing concern to many of us here in the States. When I was ordained, forty-three years ago,

-2-

homosexuality was a practically unknown rarity.  Today it is--
in the wake of World War II--rampant among men.  And whereas
seventeen years ago eight out of ten problems here would repre-
sent the alcoholic, now in the last year or so our admission
ratio would be approximately 5-2-3:% five being alcoholics; two
would be what we call "heart cases" (natural affection towards
women); and three representing aberrations involving homosexuality.
More alarming still is that among these of the 3 out of 10 class,
2 out of 3 have been young priests.

I mention this because it would seem in America at
least this type of problem is more devasting to the good stand-
ing of the priesthood than anything else.  It is very infectuous
and the prognosis for recovery extremely unfavorable.  The major-
ity of psychiatrists, physicians, and experienced priests are
not sanguine of permanent recovery.  Therefore it would seem that
more careful screening--especially the study of family background
and personal motivation--is definitely in order.

Bishop I do not quote me because this is given you
in strictest confidence, but we know of several seminaries
that have been deeply infected and this of course leads to a
wide infection.  Therefore there should be a very strict disci-
pline of dismissal and a very clear and printed teaching in the
moral theology course that mutual masturbation is a mortal sin.
Priests  develop a blind-spot on this matter which in my opinion
involves very likely the fixation of impenitence.  Seldom will
you find these men evidencing consciousness of the gravity of
what they have done.  And this apparently is reflected in the
strange attitude of Bishops who place these men after reactiva-
tion in assignments where they are most exposed to a recurrence
of a vicious habit which the majority of experts consider prac-
tically incurable.

# University of Denver Criminal Law Review

Volume 7 | Issue 1          Article 3

January 2017

# Federal Public Corruption Statutes Targeting State and Local Official: Understanding the Core Legal Element and the Government's Burden of Proving a Corrupt Intent after McDonnell

Thomas M. DiBlagio

Follow this and additional works at: https://digitalcommons.du.edu/crimlawrev

 Part of the Criminal Law Commons

**Recommended Citation**
Thomas M. DiBlagio, Federal Public Corruption Statutes Targeting State and Local Official: Understanding the Core Legal Element and the Government's Burden of Proving a Corrupt Intent after McDonnell, 7 U. Denv. Crim. L. Rev. 47 (2017)

This Article is brought to you for free and open access by the University of Denver Sturm College of Law at Digital Commons @ DU. It has been accepted for inclusion in University of Denver Criminal Law Review by an authorized editor of Digital Commons @ DU. For more information, please contact jennifer.cox@du.edu,dig-commons@du.edu.

# Federal Public Corruption Statutes Targeting State and Local Officials: Understanding the Core Legal Element and the Government's Burden Of Proving a Corrupt Intent after McDonnell

*Thomas M. DiBiagio\**

## I.  Introduction

State and local public officials who abuse their office to enrich themselves and their friends directly affect the quality of life in their communities. This conduct, left unchecked, puts into place a culture of corruption and impunity that erodes public trust in government and deters legitimate investment and commerce in the community. In response, there are three separate federal public corruption statutes that target state and local corruption. The federal program integrity statute targets a public official who demands or receives a payment "intending to be influenced" in connection with federally funded programs.[1] The federal extortion statute addresses a public official who demands or receives a benefit "under color of official right."[2] The federal mail and wire fraud statute makes it a federal crime for a public official to deny the public "honest services."[3] The recurring question has been: what conduct falls within the scope of each of these statutes? Stated another way, as practical matter, what do prosecutors need to prove and juries need to find to sustain a public corruption conviction under these three federal criminal laws?

The underlying conduct for each of these public corruption statutes is essentially transactional. All three statutes require that the government prove a connection between a benefit provided to a public official and an official act. It is this agreement—nexus to state action or the conduct of government officials—that is the criterion of guilt. The United States Supreme Court has made this point clear: first by holding that extortion under color of title and honest services fraud are limited to bribery and kickback schemes,[4] and second, by holding in *McDonnell v. United States* that the scope of an "official act" does not include routine political activities and is limited to government action.[5] However, one additional step need be taken to give structure to the statutory scheme. Because the

---

\*  Partner, Baker Botts L.L.P. and former United States Attorney for the District of Maryland.
1.  18 U.S.C. § 666(a)(1)(B) (2012).
2.  18 U.S.C. § 1951(b)(2) (2012).
3.  18 U.S.C. § 1346 (2012).
4.  *See* Skilling v. United States, 561 U.S. 358, 368 (2010) (honest services fraud); Evans v. United States, 504 U.S. 255, 256 (1992) (extortion).
5.  McDonnell v. United States, 136 S. Ct. 2355, 2358 (2016).

47

three public corruption statutes do not use the term "bribery" or "kickback," the courts have often struggled to correctly define the critical element of the offense and then to correctly translate this element into an evidentiary burden of proof.[6] This failure presents a risk that the application of the law will be inconsistent and therefore, fundamentally unfair.

The reasons for the struggle are numerous. First, courts have used the term *quid pro quo* rather than "corrupt intent" to define the critical element of the offense. Although these terms mean essentially the same thing—a link between the benefit and official act—the courts have struggled to translate *quid pro quo* into a clear evidentiary burden of proof. As a consequence, the courts have characterized the government's burden of proof in a variety of imprecise and vague ways and have stated that prosecutors must prove "some connection between the benefit and official act," "some understanding that the payment is linked to some official act," "some payment conditioned on the performance of some official act," "something short of a formalized and thoroughly articulated contractual agreement," "a corrupt payment sufficiently linked to some official act," "some connection to an official act when opportunities arise," or "some implied *quid pro quo*."

The courts should jettison these perception of the moment standards, which are difficult to truly understand, clearly articulate the critical legal element of these offenses, and bring clarity to the entire statutory scheme. First, courts should recognize that all three offenses—the federal mail and wire fraud statutes, the federal program integrity, and federal extortion statutes—are limited to bribery and kickback schemes. Second, courts should hold that the critical legal element for all three statutes requires the government to prove a corrupt intent—that the benefit provided to the public official was intended to influence or affect state action or the conduct of government officials. Third, to prove a corrupt intent, the government should be required to identify state action or government conduct at or near the time the benefit was provided to the public official. Taken together, this approach would clarify the critical legal element of the offense by limiting the scope of the statutes to bribery and kickback schemes as well as connect this legal element to a more clearly defined requirement of the offense and evidentiary burden of proof. The result would be a statutory scheme that is both fundamentally fair and captures the most pervasive and entrenched corruption schemes.

## II. *MCDONNELL V. UNITED STATES*

In *McDonnell*, the former governor of Virginia was charged with honest services fraud and extortion.[7] There was an unambiguous record of the conduct.[8] At trial, the government presented evidence that the defendant accepted $175,000 in loans, gifts, and other benefits in exchange for the defendant's influence in

---

6. *See* United States v. Tavares, 844 F.3d 46 (1st Cir. 2016) (reversing conviction and finding that government failed to prove requisite link between job offers and official act).

7. McDonnell, 136 S. Ct. at 2355.

8. Id. at 2357.

connection with an effort to have research studies undertaken at the Medical College of Virginia and University of Virginia School of Medicine.[9] The gifts themselves were legal.[10] However, the government introduced evidence that the defendant accepted these benefits in exchange for at least five "official acts."[11] Those acts included "arranging meetings" with Virginia State officials, "hosting" events at the Governor's Mansion, and "contacting other government officials" concerning the research studies.[12]

The defendant was convicted and he appealed.[13] The defendant did not deny that he received the "benefits" reflected by the evidence.[14] Moreover, the defendant did not challenge that there was some link between the loans and gifts provided and the acts taken by him.[15] He argued, however, that the acts in question were not "official acts" prohibited by the honest services fraud and extortion statute, but rather reflected routine political acts which were not prohibited by the statutes.[16] The Supreme Court agreed and reversed his conviction.[17] The Court held that an "official act" under the statutes "must involve a formal exercise of government power," and in this case, the jury was not instructed that the government was required to prove, and that they were required to find, that the conduct went beyond "simply expressing support for the research study" to "pressuring or advising another government official on a pending matter."[18]

The Supreme Court expressed concern about where the line should be drawn between routine political acts and illegal behavior and held that an "official act" under the federal bribery statute means "a formal exercise of government power."[19] The Court then explained that, "[a]lthough it may be difficult to define the precise reach of those terms, it seems clear that a typical meeting, telephone call, or event arranged by a public official does not qualify as a 'formal exercise of government power.'"[20] On the other hand, the Court found that "[u]sing your official position to exert pressure on another public official to perform an 'official act' would fall within the scope of the formal exercise of government power."[21] The Court held that a conviction was dependent on a specific finding by the jury

---

9. Id. at 2357.
10. Id. at 2365.
11. *Id.*
12. *Id.* at 2358.
13. *Id.* at 2367.
14. *Id.* at 2366.
15. *Id.*
16. *Id.*
17. Id. at 2355.
18. *Id.* at 2358.
19. *Id.* at 2371.
20. *Id.* at 2358.
21. *Id.* at 2359. *See also* United States v. Repak, ___F.3d ____ (3rd Cir. 2016) (affirming public corruption conviction and finding that influencing and facilitating the award of economic redevelopment contracts by executive director of local redevelopment authority was an "official act" under *McDonnell*).

that the defendant agreed to take formal and concrete government action in exchange for the benefit provided:

> It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an "official act" at the time of the alleged "*quid pro quo*." The jury may consider a broad range of pertinent evidence, including the nature of the transaction, to answer that question.
>
> Simply expressing support for the research study at a meeting, event, or call-or sending a subordinate to such a meeting, event, or call-similarly does not qualify as a decision or action on the study, as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an "official act." Otherwise, if every action somehow related to the research study were an "official act," the requirement that the public official make a decision or take an action on that study, or agree to do so, would be meaningless.
>
> Of course, this is not to say that setting up a meeting, hosting an event, or making a phone call is always an innocent act, or is irrelevant, in cases like this one. If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act. A jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give the advice in exchange for a thing of value, that would be illegal.[22]

The Supreme Court's decision in *McDonnell* provides some structure to the application of the federal statutory scheme used to prosecute state and local officials. However, the decision is also limited and does not resonate beyond the particular conduct of the defendant in that case. On the other hand, there is a more compelling theme being stated. The Court is clearly expressing a concern about the exercise of prosecutorial discretion and the need for a fundamentally fair application of the law—that it should be applied as a "scalpel" rather than a "meat axe."[23]

Accordingly, there is one more step that needs to be taken. This article sets forth a clear outline of the federal statutory scheme used to target corrupt state and local officials and then argues for an additional step—that courts should now require the prosecution to prove a direct connection between the benefit provided to a public official and the official act.

---

22. Id. The government subsequently abandoned its prosecution of the defendant. See Alan Blinder, U.S. Ends Corruption Case Against Former Governor of Virginia, N.Y. TIMES, September 9, 2016.

23. McDonnell, 136 S. Ct. at 2373.

### III. FEDERAL PUBLIC CORRUPTION STATUTES

#### A. INTRODUCTION

There are three primary federal statutes employed by federal prosecutors against state and local corruption. First, the federal program integrity statute addresses state and local programs that receive federal funds and makes it a crime for a public official to demand or receive a payment "intending to be influenced."[24] Second, the federal extortion statute makes it a federal crime for a public official to use his position as a government official to extort money or property from a third party.[25] Third, the federal mail and wire fraud statute makes it a federal crime to use the mails or interstate wires in connection with a scheme to defraud.[26] Section 1346 defines a "scheme to defraud" to include defrauding the public of the "intangible right to honest services."[27] In *Evans v. United States*,[28] the Supreme Court limited the scope of the public corruption component of the federal extortion statute to bribery and kickback schemes.[29] In *Skilling v. United States*,[30] the Supreme Court narrowed the scope of honest services fraud to bribes and kickback payments linked to official acts.[31] Because the federal program integrity statute is *in pari materi* with the honest services and extortion statutes—all are bribery related offenses and share the identical core element—extending this limitation to federal program bribery is obvious.

The commonality of each of these federal corruption statutes reaches beyond the objective to hold public officials accountable for pervasive and entrenched corrupt practices. Although the statutes do not use the terms "bribery" or "kickback," all three statutes are essentially bribery and kickback offenses and share a core legal element—that the government prove a sufficient nexus between the benefit provided to a public official and state action or the conduct of government officials. Therefore, to sustain a conviction the government must prove, and the jury must find, a corrupt intent. To establish a corrupt intent, the government must prove that the benefit was intended to influence state action or

---

24. 18 U.S.C. § 666(a)(1)(B) (2012).

25. 18 U.S.C. § 1951(b)(2) (2012).

26. 18 U.S.C. §§ 1341, 1343, 1346 (2012).

27. 18 U.S.C. § 1346 (2012).

28. Evans v. United States, 504 U.S. 255, 256 (1992).

29. Prosecutions for extortion under color of official right is essentially a bribery offense requiring proof of a *quid pro quo*. *Id.* at 268.

30. Skilling v. United States, 561 U.S. 358 (2010). In *Skilling*, the government alleged that the defendant, an executive of a private corporation, engaged in self-dealing but did not allege that he solicited or accepted a bribe or kickback from a third party in exchange for making misrepresentations to his company's shareholders about the company's fiscal health. The Supreme Court determined that the defendant's honest services fraud conviction was flawed and reversed his conviction. *Id.* at 414–15. *See also* United States v. Cantrell, 617 F.3d 919, 921 (7th Cir. 2010) (affirming honest fraud conviction after *Skilling* based on kickbacks to public official—steering public contracts to a third party in exchange for a share of the proceeds).

31. Skilling, 561 U.S. at 409.

the conduct of a government official. To prove this connection, the prosecution should be required to identify the state action or the conduct of government at or near the time that the benefit is provided to the public official.

## B. INTENT OF THE FEDERAL PUBLIC CORRUPTION STATUTES

The federal public corruption statutory scheme is intended to serve the public's interest by holding government officials accountable for pervasive and entrenched corrupt practices. Beyond the erosion of trust in government, public corruption undermines the quality of life in the community. State and local corruption is typically characterized by "pay to play," [32] bribery,[33] and kickback schemes[34] conducted among a class of fixers who specialize in connecting public officials with businessmen.[35] Because state and local governments are primarily

---

32. The phrase "pay to play" typically references two practices that lead to corruption: (1) companies use political donations and other financial benefits to public officials to bribe their way to securing lucrative government contracts; and (2) public officials extorting financial benefits from companies that wish to do business with the government. See, e.g., Benjamin Weiser, William Rashbaum & Vivian Yee, Ex-Cuomo Aides Charged in Federal Corruption Inquiry, N.Y. TIMES (Sept. 23, 2016), http://www.nytimes.com/2016/09/23/nyregion/cuomo-former-aides-charges.html (federal public corruption indictment alleging that state funded economic development contracts were awarded in exchange for bribes to public officials); Campbell Robertson, Nagin Guilty of 20 Counts of Bribery and Fraud, N.Y. TIMES (Feb. 12, 2014), http://www.nytimes.com/2014/02/13/us/nagin-corruption-verdict.html?_r=0 (describing conviction of former Mayor of receiving vacations, cash and building supplies in exchange for government contracts).

33. The term "bribe" means a payment in return for a vote, appointment, or other public act by a lawmaker or government official. See, e.g., Benjamin Weiser, Ex-councilwoman and Admirer Found Guilty in Yonkers Case, N.Y. TIMES (Mar. 30, 2012), http://www.nytimes.com/2012/03/30/nyregion/two-convicted-in-yonkers-corruption-case.html. In this case, prosecutors introduced evidence that the defendant, a former City council member, accepted $195,000 in payment (including a down payment on her residences, payments for her student loans and a Mercedes) from a political operative in exchange for votes to approve a proposed luxury mall and housing complex. The jury rejected the defense argument that the benefits reflected gifts and a romantic relationship. See also Benjamin Weiser, Lobbyist is Expected to Enter Guilty Plea in Corruption Case, N.Y. TIMES (Jan. 3, 2012), http://www.nytimes.com/2012/01/04/nyregion/guilty-plea-by-richard-lipsky-lobbyist-is-expected-in-bribery-case.html (describing scheme where lobbyist paid New York State Senator cash in exchange for Senator's public action including sponsoring and supporting legislation, lobbying other elected officials, and directing state funds for the benefit of lobbyist).

34. In the public corruption context, the term "kickback" means a payment in return for a government contract. See William K. Rashbaum, City Official Accused of Taking Bribes, Left in Boxes and Cups, N.Y. TIMES (Oct. 6, 2011), http://www.nytimes.com/2011/10/07/nyregion/nyc-housing-official-is-among-7-charged-with-bribery.html (describing charges against commissioner at the New York Department of Housing Preservation and Development based on allegations that the defendant took $600,000 in bribes and kickbacks from developers in exchange for steering city contracts to the developers and that the cost of the kickbacks were passed on to the city through inflated invoices); See Cantrell, 617 F.3d at 921 (affirming conviction based on defendant's use of his office to secure contracts for company in exchange for share of proceeds).

35. See William K. Rashbaum, Albany Trials Exposed the Power of a Real Estate Firm, N.Y. TIMES (Dec. 18, 2015), https://www.nytimes.com/2015/12/19/nyregion/real-estate-firms-power-is-laid-bare-in-fall-of-albany-leaders.html ("The recent federal trials that ended in the quick convictions of Sheldon Silver and Dean G. Skelos laid bare a world of greed, flagrant corruption and abuse of power

responsible for providing critical public services such as education, public safety, healthcare, public assistance for the poor, and building roads, bridges, schools, and libraries, corruption at this level has a corrosive and distorting impact on the quality of life in the community.[36] In particular, pervasively corrupting influences intended to manipulate and orchestrate the awarding of public contracts and services in return for bribes or kickbacks divert limited government resources away from needed community services.[37] In addition to diverting public money, corrupt practices that manipulate government contracts and municipal services further undermine economic growth by putting in place a culture of corruption that deters legitimate investment and commerce. The added cost of doing business in a

---

in Albany, with evidence showing payoffs taking a deceptive circular route from business interests to the elected officials whose help they sought."). As a practical consequence, the enforcement of these federal corruption statutes typically targets powerful public officials and money interests. The enforcement of these laws, therefore, serves to further public confidence in the justice system by sending a compelling message to the community that the laws apply to everyone. See Joe Nocera, How to Prevent Oil Spills, N.Y. TIMES (Apr. 14, 2012), http://www.nytimes.com/2012/04/14/opinion/nocera-how-to-prevent-oil-spills.html ("I have argued in the past, mainly in the context of the financial crisis, that the country has been poorly served by the Justice Department's unwillingness to hold to account big shots like Angelo Mozillo, the former chief executive of Countrywide, whose companies' illegal practices helped lead us to the brink of financial apocalypse. It has sent a terrible message that there are two kinds of justice; one for the rich and powerful; and another for everybody else."); see also Joe Nocera, Biggest Fish Face Little Risk of Being Caught, N.Y. TIMES (Feb. 25, 2011), http://www.nytimes.com/2011/02/26/business/economy/26nocera.html.

36. See Richard Perez-Pena, *13 Detroit School Principals Charged in Vendor Kickback Scheme*, N.Y. TIMES (Mar. 29, 2016), https://www.nytimes.com/2016/03/30/us/13-detroit-school-principals-charged-in-vendor-kickback-scheme.html ("In Detroit's crumbling schools, where the threat of insolvency means that basic repairs, supplies and even teachers are in short supply, 13 principals conspired with a vendor to defraud the system, siphoning away millions of dollars . . . The principals . . . ordered supplies like paper, workbooks and chairs from the vendor, the Detroit Public Schools paid the bills. The vendor then delivered only some of the supplies to the schools and paid $908,518 in kickbacks to the principals . . . ."); Benjamin Weiser & Marc Santora, *In 2nd Alleged Bribe Scheme, a Legislator was in on the Case*, N.Y. TIMES (Apr. 4, 2013), http://www.nytimes.com/2013/04/05/nyregion/assemblyman-eric-stevenson-is-accused-of-taking-bribes.html?pagewanted=all (describing corruption charges against New York State assemblymen based on cash payments in exchange for assistance in opening adult day care centers and introducing legislation to block competing operators from opening centers); Mary M. Chapman, *Former Mayor of Detroit Guilty in Corruption Case*, N.Y. TIMES (Mar. 11, 2013), a http://www.nytimes.com/2013/03/12/us/kwame-kilpatrick-ex-mayor-of-detroit-convicted-in-corruption-case.html (describing conviction of former Mayor of public corruption charges based on an pervasive practice of shakedowns, kickbacks, and bid-rigging schemes); Monica Davey & Mary Williams Walsh, *Billions in Debt, Detroit Tumbles into Insolvency*, N.Y. TIMES (July 18, 2013), http://www.nytimes.com/2013/07/19/us/detroit-files-for-bankruptcy.html?pagewanted=all (describing Detroit's filing for bankruptcy); Mary Williams Walsh, *In Alabama, a County that Fell Off the Financial Cliff*, N.Y. TIMES (Feb. 18, 2012), http://www.nytimes.com/2012/02/19/business/jefferson-county-ala-falls-off-the-bankruptcy-cliff.html (describing largest Chapter 9 municipal bankruptcy resulting from sewer project and corrupt financial schemes). In addition to the corruption involving government contacts, municipal debt financing and bond issuances has also been corrupted by the self-dealing by public officials.

37. A substantial portion of these public projects, although administered by state and local officials, are funded by federal programs and grants.

culture of corruption deters individuals from starting new businesses and deters existing businesses from growing.[38] However, the clear harm to the community does not outweigh the need to ensure a fundamentally fair application of the law.

### C.    18 USC § 1346 Mail and Wire Fraud

The federal mail and wire fraud statutes make it a crime to use the mails or interstate wires in connection with a scheme to defraud. Section 1346 defines a "scheme to defraud" to include defrauding the public of the "intangible right of honest services."[39] The meaning of the form "intangible right of honest services" has been clearly defined by the Supreme Court to be limited to a bribery or kickback scheme.[40] Therefore, after *Skilling*, to sustain an honest services fraud conviction, the government must prove that: (1) the defendant demanded or accepted a bribe or kickback; and (2) used the mails or wires in furtherance of the criminal activity.[41]

The Fourth Circuit's decision in *McDonnell* provides relevant guidance on the standard of proof to establish corrupt intent. The *McDonnell* court held that to prove a corrupt intent, the prosecution must demonstrate more than an

---

38. See Matthew Dolan, *Detroit Arena's Revival Points a Way for City*, WALL ST. J. (Apr. 23, 2012, 10:32 PM), http://www.wsj.com/articles/SB10001424052702304331204577352210951231234. Describing the challenges in reviving the Cobo convention center after years of widespread corruption, Dolan explained:

> To be sure, the convention center's financial challenges pale next to the fiscal crisis gripping Detroit. Under the weight of a $265 million deficit and no infusion of cash from Michigan on the horizon, it will be a tough road to recovery for a city that lost one-quarter of its population between 2000 and 2010.
>
> . . . Cobo . . . was long a troubled asset for Detroit. Less than one-third of its 700,000 square feet of exhibit space was used for many years. It tied for last place in hosting national conventions and trade shows among similarly sized centers, according to a 2010 report from Conventions, Sports & Leisure, a consulting firm.
>
> A big drawback [to attracting conventions]: widespread corruption that inflated exhibitors' costs. Two successive Cobo directors were sent to federal prison in 2009 for taking bribes from a contractor who provided electrical, janitorial, catering and retail services. Patrons and exhibitors also complained of Cobo's poor food, parking hassles and inefficient loading docks.

*Id.*

39. 18 U.S.C. § 1346 (2012).

40. *Skilling*, 561 U.S. at 368.

41. *Id.* at 412-13; See United States v. George, 676 F.3d 249, 252 (1st Cir. 2012) (explaining that the Supreme Court "truncated the reach" of the honest services fraud in Skilling by limiting it to bribery and kickback schemes); United States v. Barraza, 655 F.3d 375, 382 (5th Cir. 2011) (stating that "honest services fraud only consists of bribery and kickbacks, not the failure to disclose receipt of money"); United States v. Bryant, 655 F.3d 232, 243–44 (3d Cir. 2011) (stating that Skilling "defined the 'core' of honest services fraud" to include only bribery and kickback schemes); Ryan v. United States, 645 F.3d 913, 914 (7th Cir. 2011), vacated, 132 S. Ct. 2009 (2012), remanded 688 F.3d 845 (7th Cir. 2012) (explaining that Skilling held that the honest services form of the mail-fraud offense "covers only bribery and kickback schemes").

Case 1:23-cv-00390-DHU-JFR   Document 1   Filed 05/05/23   Page 89 of 111
DiBlagio: Federal Public Corruption Statutes Targeting State and Local Offi

2017          FEDERAL PUBLIC CORRUPTION STATUTES          55

expectation.[42] On appeal, the *McDonnell* defendant claimed that the district court's jury instruction failed to require the government to sufficiently prove that the benefits were sufficiently linked to a specific official act.[43]

The appellate court agreed with the defendant's contention that a higher standard of proof applied, but rejected his argument that the district court failed to properly instruct the jury on the law.[44] The court clearly affirmed the higher burden of proof and confirmed that the government was required to prove that the benefits were linked to a specific act.[45] The court first acknowledged that both honest services fraud and extortion are essentially bribery offenses requiring the government to prove a *quid pro quo*.[46] The court then defined the term *quid pro quo* to require the government to prove a corrupt intent—intent on the part of the defendant to influence a specific official act.[47] The court found that proving that a benefit was provided to a public official to generate good will is not enough.[48] The court then explained that bribery occurs only if the benefit is "coupled with a particular criminal intent" and this intent must be more than "a vague hope or expectation" that the public official will "reward the generosity."[49] The court then held that the government must show that the defendant intended to secure or influence a "specific official action."[50]

The Court of Appeals in *McDonnell* concluded that the district court clearly articulated this standard to the jury and that the evidence was sufficient to establish a "corrupt understanding."[51] The defendant had received money, loans, favors, and gifts, and those benefits were linked to efforts to obtain research at a state university, state grant funds, and coverage for the dietary supplement under the state employee health care.[52] The "temporal relationship" between the benefits provided to the defendant and the official acts represented "compelling evidence of corrupt intent": none of these gifts were goodwill gifts from one friend to another. Indeed, the defendant had no relationship with the company until after he was elected                                                                    Governor.[53]

However, courts have generally not articulated such a clear evidentiary standard and have imposed a lower standard of proof on the government. The courts have accepted the ambiguity and have not required the government to identify the temporal connection between the state action and the benefit provided,

---

42. United States v. McDonnell, 792 F.3d 478, 487-92 (4th Cir. 2015), cert. granted in part, 1365 S. Ct. 89 (2016), and vacated and remanded, 136 S. Ct. 2355 (2016).

43. *Id.* at 505.

44. *Id.* at 514.

45. *Id.*

46. *Id.* at 506.

47. Id. at 514.

48. Id. at 515.

49. *Id.*

50. *Id.*

51. *Id.* at 514.

52. *Id.* at 518-19.

53. *Id.* at 519-20.

and have held that to sustain an honest services conviction the government meets its burden of proof by demonstrating only that the benefits were provided to the public official to influence some official act.[54] For example, in *United States v. Bryant*, the defendants, a New Jersey State Senator and the Dean of the School of Osteopathic Medicine, were charged with honest services fraud and federal program bribery.[55] At trial, the government presented evidence that the senator received a "low-show" job at the medical school as a "Program Support Coordinator" in exchange for his efforts as the chairman of the Senate Appropriations Committee to funnel state funding to the school.[56] The government asserted that as a result of this corrupt relationship, an additional $10 million in funding was provided to the medical school over a three-year period.[57] The defendants were convicted and appealed.[58] On appeal, the defendants argued that the evidence was insufficient to sustain the convictions and that the district court's jury instruction on both charges was defective.[59]

The Third Circuit first ruled that the evidence was sufficient to prove a link between the employment at the medical school and the state funding.[60] The court found that the evidence indicated that the defendants had an understanding, even if implicit, that his salary, bonus, and pension eligibility from his position at the medical school was given in exchange for efforts to increase state funding for the school.[61] The court primarily relied on the timing of the efforts to increase funding over the course of his nearly three-year employment to establish the link.[62]

The defendants complained that the jury instructions for the honest services fraud counts were flawed in light of *Skilling*.[63] Specifically, the defendants asserted that the district court's jury instruction did not make clear that the jury was required to find that the benefits were intended to "alter" the actions of the public official.[64] The appellate court rejected the defendants' "alter" theory and found that the trial court's instructions correctly set forth the government's burden of proof.[65] The court explained that to prove a *quid pro quo* in support of honest services fraud, the government is not required to present evidence that attributes each corrupt payment to each official action by the public official.[66] Rather, the court found that it was enough for the government to present evidence that there

---

54. *See, e.g.*, United States v. Bryant, 655 F.3d 232, 236–37 (3d Cir. 2011).
55. *Id.* at 236–37. For other examples from the Third Circuit, see United States v. Wright, 665 F.3d 560 (3d Cir. 2012) and United States v. Kemp, 500 F.3d 259 (3d Cir. 2007).
56. *Id.* at 237.
57. *Id.*
58. *Id.*
59. *Id.* at 240.
60. *Id.*
61. *Id.* at 241.
62. *Id.*
63. *Id.* at 243.
64. *Id.* at 244.
65. *Id.* at 245.
66. *Id.* at 241.

Case 1:23-cv-00390-DLH-JFR Document 1 Filed 05/05/23 Page 91 of 111

was "an intent to influence" sufficient to establish the link between the payments and some official action.[67]

In *United States v. Rosen*, the defendants, the chief executive of a network of hospitals and three New York State legislators, were charged with honest services fraud.[68] At trial, federal prosecutors introduced evidence that showed that the chief executive provided the legislators with consulting fees in exchange for state financial assistance for the hospitals.[69] The defendants argued that the payments were legitimate consulting fees and were not directly connected to any specific official act.[70] However, the government pointed out that a close examination of the evidence revealed that little or no consulting work was performed under the contracts.[71] Thus, the defendants were convicted and subsequently appealed.[72]

On appeal, the defendants argued that the evidence was insufficient to prove the existence of the required *quid pro quo* to sustain the charges.[73] The Second Circuit rejected the defendants' assertion. The court first ruled that the illegality of an "as opportunities arise" or series of corrupt payments was a valid prosecution theory.[74] Therefore, the court held that in cases involving public officials, a trier of fact may "infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt."[75] The court was not persuaded that any direct link was required to sustain a conviction, stating, "evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of clear admissions and expressions of intentions in documents or conversations."[76] Rejecting the assertion that the payments were gratuities rather than bribes, the court found that the amounts involved exceeded what reasonably could be expected for a gratuity.[77] Additionally, the court concluded that any collateral benefit to the public from the bribery scheme was irrelevant and held that "an illegal *quid pro quo* exchange persists even though the state legislator's acts also benefit constituents other than the defendant."[78]

In *United States v. McDonough*, the First Circuit held that a lower standard of proof applied and that the government was not required to prove that

---

67. *Id.* at 241.
68. United States v. Rosen, 716 F.3d 691, 694 (2d Cir. 2013). For other examples from the Second Circuit, see *United States v. Bruno*, 661 F. 3d 733 (2d Cir. 2011) and *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007).
69. *Id.* at 702.
70. *Id.*
71. *Id.* at 702–03.
72. *Id.* at 698–99.
73. *Id.*
74. *Id.* at 700.
75. *Id.* at 702–03.
76. *Id.*
77. *Id.* at 702–04.
78. *Id.* at 701–02.

the defendant intended to influence a specific state action, but rather only that the defendant desired to induce some official act.[79] In this case, the defendants, the former Speaker of the Massachusetts House of Representatives and a lobbyist, were convicted of honest services fraud and extortion.[80] At trial, the government introduced evidence that the defendants were provided cash payments in exchange for influencing the award of and ensuring funding for two state software contracts.[81]

On appeal, the appellate court held that the evidence was sufficient to prove that the defendants received a series of payments that were sufficiently connected to official acts to sustain both the honest services and extortion convictions.[82] The court explained that:

> [T]he government must prove . . . the receipt of something of value "in exchange for" an official act. Such an agreement need not be tied to a specific act by the recipient. "It is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose." Ultimately, [w]hat is needed is an agreement . . . which can be formal or informal, written or oral . . . We start by noting that "evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions."[83]

In *United States v. Whitfield*, the defendants, a trial attorney and two state court judges, were charged with various public corruption offenses based on loan guarantees that were provided in exchange for favorable decisions on cases pending before the judges.[84] At trial, the government introduced evidence that the judges accepted these loan guarantees but never intended to pay them back.[85] The government also presented evidence that called into question the legitimacy of the loans based on the timing of the financial transactions.[86] More specifically, the defendant attorney had a significant contingency fee case pending before each of the defendant judges.[87] The defendants were convicted and they appealed.

The Fifth Circuit rejected the defendants' claim that the government was required to prove a direct link between the payment and specific official acts identified at the time loans were arranged or guaranteed.[88] Rather, the court held

---

79. United States v. McDonough, 727 F.3d 143, 153 (1st Cir. 2013). For another example from the First Circuit, see *United States v. Urchiuoli* 613 F.3d 11 (1st Cir. 2010).

80. *Id.* at 148–52.

81. *Id.* at 153.

82. *Id.* at 156.

83. *Id.* at 152–53 (citations omitted).

84. United States v. Whitfield, 590 F.3d 325, 335 (5th Cir. 2009).

85. *Id.* at 336.

86. *Id.* at 337.

87. *Id.*

88. *Id.* at 351–53.

that the government was only required to prove that the payment was demanded or accepted for some official act.[89] The court explained that as a practical matter, "it would have been impossible" for the defendants to have agreed on what cases the judges would fix at the time the loans were arranged because one of the cases at issue had not been filed in one judge's court and the other judge was only then running for election and "was not yet on the bench."[90] The district court's jury instructions explained that:

> In order to prove the scheme to defraud another of honest services through bribery, the Government must prove beyond a reasonable doubt that the particular defendant entered into a corrupt agreement to provide the particular judge with things of value specifically with the intent to influence the action or judgment of the judge on any question, matter, cause or proceeding which may be then or thereafter pending subject to the judge's action or judgment.[91]

The defendants also complained that because the loan guarantees were made in the context of the defendant's electoral campaigns, their constitutional right to free political speech was at stake in this case.[92] As a consequence, the defendants argued that the *McCormick*[93] standard applied and required the government to prove that there was an explicit *quid pro quo* involving a specific official act identified at the time that the defendant arranged and guaranteed the loans from the bank.[94] The defendants claimed that, by failing to sufficiently require a *quid pro quo* exchange, the district court allowed the jury to convict them for acts that essentially amounted to gratuity, not bribery.[95]

The court acknowledged that the government was required to prove that the payment was sufficiently linked to an official act.[96] However, the court held that the district court accurately set for this legal element and burden of proof:

> For the sake of argument, we will assume that *McCormick* [does] apply and that a *quid pro quo* instruction was required in this case. In doing so, we are also willing to assume that the initial $40,000 loan guarantee to [defendant] and the $25,000 loan guarantee to [defendant] were campaign contributions. However, we reject any attempt to characterize the $100,000 loan guarantee to [the defendant] for the down-payment on

---

89. *Id.* at 353.
90. *Id.* at 353 n.17.
91. *Id.* at 348.
92. *Id.* at 348.
93. In *McCormick v. United States*, the Court held that when the benefit takes the form of a campaign contribution, the government must prove a direct connection between the payment and a specific official act. 500 U.S. 257, 273 (1991).
94. 590 F.3d at 348-49.
95. *Id.* at 349.
96. *Id.* at 352-53.

a home and the financial and legal assistance provided to [defendant] in connection with his state prosecution for embezzlement as having anything to do with their respective electoral campaigns. Still, even if we assume that a *quid pro quo* instruction was necessary because at least some of the financial transactions in question were campaign-related, we conclude that the jury charge in this case sufficiently fulfilled that requirement.

Despite the district court's failure to include the actual phrase *quid pro quo* in the jury charge, in the instant context the instructions sufficiently conveyed the "essential idea of give-and-take." Under the undisputed facts here, the jury's finding that there was a corrupt agreement necessarily entailed a finding of an *exchange* of things of value for favorable rulings in the judges' courts. Therefore, to the extent that a *quid pro quo* instruction may have been required in this case, the district court adequately delivered one.[97]

In *Ryan v. United States*, the former Governor of Illinois moved to vacate, set aside, or correct his sentence for honest services fraud.[98] At his initial trial, the government introduced evidence that the defendant accepted kickbacks in the form of financial benefits in exchange for steering state contracts.[99] The court denied the defendant's motion to vacate his conviction and found that the jury instructions and evidence supported a corrupt payment theory—that the defendant was provided financial benefits in exchange for an official act.[100]

The court explained that the "stream of benefits theory" allows for a bribery or kickback conviction based on evidence that benefits were provided to the public official during the same period of time that the public official exercised influence and favorable treatment.[101] The court explained that:

> [The defendant] is correct that, post- *Skilling*, an honest services fraud conviction does require a bribery or kickback scheme. As the court reads the challenged instruction, however, nothing in it suggests such a scheme is not a required path to conviction. In fact, this instruction taken alone suggests that a bribe is required for conviction. The instruction requires that "the government prove[ ] beyond a reasonable doubt that the public official accepted the personal and financial benefits with the understanding that the public official would perform or not

---

97. *Id.* at 353.

98. Ryan v. United States, 759 F. Supp. 2d 975, 977-78 (N.D. Ill. 2010), aff'd, 645 F.3d 913 (7th Cir. 2011), vacated on other grounds, 132 S. Ct. 2099 (2012), remanded, 688 F.3d 845 (7th Cir. 2012).

99. *See* United States v. Warner, No. 02 CR 506-1, 2006 WL 2583722 at *2 (N.D. Ill. Sept. 7, 2006).

100. *Ryan*, 759 F. Supp. 2d at 987–88.

101. *Id.* at 984–85.

perform acts in his official capacity in return—an instruction indistinguishable from a bribery instruction.[102]

The law does not require that the government identify a specific official act given in exchange for personal and financial benefits received by the public official so long as the government proves beyond a reasonable doubt that the public official accepted the personal and financial benefits with the understanding that the public official would perform or not perform acts in his official capacity in return.

Likewise, the law does not require that the government identify a specific official act given in exchange for personal and financial benefits received by the public official so long as the government proves beyond a reasonable doubt that the personal and financial benefits were given with the understanding that the public official would perform or not perform acts in his official capacity in return.[103]

The court then addressed the defendant's challenge to the campaign contribution instruction. The defendant asserted that the government was required to prove a direct link between the campaign contribution and a specific official act.[104] The district court found that the *McCormick* standard applied to honest services prosecutions and agreed that the government was required to prove a direct link between a benefit and official act.[105] However, the court found that the jury was given the required instruction: "a campaign contribution can be deemed a bribe only if the money is given in return for a commitment to take (or not take) a specific action."[106]

In *United States v. DiMasi*, the Speaker of Massachusetts House of Representatives, was convicted of honest services fraud and extortion.[107] At trial, the government introduced detailed evidence that the defendant received kickbacks in exchange for steering and funding state contracts for computer software.[108] The government relied on this evidence to support both charges.[109] In a post-trial motion, the defendant asserted that the evidence was not sufficient to support the convictions and that the district court's jury instructions on honest services and extortion were not correct statements of the law.[110] The defendant asserted that the government was required to prove a direct link between the benefits and a specific official act.[111]

---

102. Id. at 986 (citations omitted).
103. *Id.* at 987–88 (quoting district court's jury instructions).
104. *Id.* at 986–87.
105. *Id.* at 989.
106. *Id.*
107. United States v. DiMasi, 810 F. Supp. 2d 347, 349, 360 (D. Mass. 2011).
108. *Id.* at 357–58.
109. *Id.* at 360.
110. *Id.* at 350.
111. *Id.* at 354 n.4.

The district court denied the defendant's motion.[112] The court first recognized that honest services fraud and extortion share a core legal element and that to sustain the honest services and extortion convictions, the government was required to prove a link between the payment and an official act.[113] The court then found that the evidence was sufficient to support the defendant's convictions.[114] The court determined that the evidence showed that: (1) the firm seeking state contracts made monthly retainer payments to the defendant's law practice; (2) there were discussions with the defendant about potential contracts; (3) the defendant was given talking points in support of the contracts; (4) the defendant actually used one of those points in an effort to influence a state agency to award contracts; (5) the defendant worked consistently and successfully to provide funding; and (6) the state contracts were actually awarded to the firm that provided the benefits.[115]

The court rejected the defendant's assertion that the government was required to prove that the payment was directly linked to an identifiable official act.[116] The court also found that the government could rely on circumstantial evidence to prove the link: "an unlawful agreement . . . need not be express, [and] can be proven by inference, based on circumstantial evidence."[117]

In *United States v. Mosberg*, a real estate developer was charged with honest services fraud in connection with his relationship with the attorney for the local town planning board.[118] The government argued that the defendant engaged in several real estate deals with the attorney's family members in exchange for influence and favorable treatment in connection with numerous pending real estate development projects.[119] Specifically, the indictment alleged that the defendant " 'g[a]ve the Attorney . . . a stream of concealed bribes . . . often in the form of favorable real estate transactions, *in exchange for* the Attorney exercising . . . "official authority" ' to assist the defendant.[120]

Prior to trial, the defendant moved to dismiss the indictment complaining that it failed' to allege a *quid pro quo* bribery scheme consistent with *Skilling* and

112. *Id.* at 362, 366.
113. *Id.* at 353–56.
114. *Id.* at 361.
115. *Id.* at 358–60.
116. *Id.* at 354.
117. *Id.* at 355. The district court's instructions required proof that payments were made with the intent to influence an official act:

> The jury was also instructed that it was not necessary for the government to prove that the scheme involved making a specific payment for a specific official act; rather, it would be sufficient if the government proved beyond a reasonable doubt a scheme to make a series of payments in exchange for [the defendant] performing official actions benefitting [others] as opportunities arose.

*Id.* at 356.
118. United States v. Mosberg, 866 F. Supp. 2d 275, 280–82 (D.N.J. 2011).
119. *Id.*
120. *Id.* at 288 (quoting the government indictment).

with pre-*Skilling* case law.[121] In particular, the defendant argued that the indictment was required to allege a direct link between the real estate deals and specific official acts.[122] The district court disagreed and denied the defendant's motion.[123] The court held that the indictment sufficiently alleged a nexus between the payment and some official acts: "[t]he Indictment alleges the elements of honest services fraud, and apprises [the defendant] of the sort of bribery scheme that he must defend against—favorable real estate deals in exchange for expediting or favorably resolving Planning Board matters and Township litigation."[124] The court also acknowledged that this legal element was common to both program bribery and honest services charges.[125]

### D.   18 USC § 1951 EXTORTION

Section 1951, the federal extortion statute, or the Hobbs Act, makes it a crime for a person to commit extortion either (1) through threatened force, violence or fear; or (2) "under color of official right."[126] To convict a defendant of extortion under a color of official right, courts have typically identified the elements as follows: (1) the defendant must be a public official; (2) who solicited or accepted a payment ("money or property"); (3) the payment must have been induced "under color of official right"; and (4) there must have been at least a *de minimis* effect on commerce.[127] The text of the statute does not use the term "bribe" or "kickback." However, in *Evans v. United States*, the Supreme Court limited extortion under color or official right to bribery and kickback schemes.[128]

---

121. *Id.*
122. *Id.* at 283–84.
123. *Id.* at 315.
124. *Id.*
125. *Id.* at 304. The district court held that a corrupt payment can exist even if the public official takes official action that he always intended:

> [A]n allegation that a [public official] "exchanged" official actions for a bribe necessarily means that the bribe had some influence on that discretion—even if, as things turned out, the official's actions were the same as they would have been absent the bribe. This is because the "exchange" removes discretion from the legislator—which he is obligated to exercise in the best interests of the public—and instead locks him into a position favoring one constituent, as dictated by the *quid pro quo* arrangement.

*Id.* at 295 (internal citation omitted).
126. 18 U.S.C. § 1951(b)(2) (2012).
127. 18 U.S.C. § 1951. *See* Sekhar v. United States, 133 S. Ct. 2720 (2013) (reversing Hobbs Act conviction and holding that internal recommendations of an attorney are not transferable and therefore not property under Section 1951); United States v. Kincaid-Chauncey, 556 F.3d 923, 936 (9th Cir. 2009); Evans v. United States, 504 U.S. 255, 267 (1992) (defining "money or property" under § 1951 to include any property that is transferable).
128. 504 U.S. at 258, 260, 268 (1992). *See also* United States v. Blagojevich, 794 F.3d 729 (7th Cir. 2015) (recognizing that to sustain conviction under extortion statute government must prove a *quid pro quo*–that a public official performed an official act in exchange for a private benefit but reversing conviction and holding that scope of *quid pro quo* does not include the exchange of an official act for another official act).

Therefore, prosecutions for extortion under color of official right, similar to prosecutions under other bribery related statutes, require the government to prove a corrupt intent—intent to influence state action or the conduct of government.

> The courts, however, have been reluctant to impose this burden of proof in extortion cases and have sustained convictions under lower standards of proof. For example, in *United States v. Kincaid–Chauncey*, the Ninth Circuit held that to sustain an extortion conviction "under color of official right," where the payment is not a campaign contribution, the government is required to prove a direct link between a benefit and official act.[129] In *Kincaid*, a member of the Clark County Commissioners was charged with extortion.[130] At trial, the government introduced evidence that the defendant received cash payments in exchange for influence and favorable treatment in connection with ordinances, permits, and licenses affecting the operation of adult clubs in Las Vegas.[131] The district court instructed the jury that in order for the defendant to be found guilty of extortion "under official right," the government must prove that: (1) the defendant was a public official; (2) the defendant obtained money or property; (3) the defendant knew that the money was given in return for taking some official action; and (4) there was an impact on interstate commerce.[132]

On appeal, the defendant argued that the district court erred by failing to instruct the jury that to sustain the conviction the government was required to prove and the jury was required to find a *quid pro quo*—a direct link between the payment and a specific official act.[133] The Ninth Circuit disagreed and affirmed the conviction.[134] The court viewed extortion and bribery *in pari materia* and held that each requires a connection between the benefit provided to the public official and an official act.[135] However, the court held that a lower standard of proof applied to sustain an extortion conviction and reasoned that where the payment is not a campaign contribution, the government was required to prove only a sufficient link between the payment and some official act, rather than a direct link between the payment and a specific official act.[136] The court's statements as to what was sufficient to sustain a conviction were less than convincing. The court explained that there must be "some understanding that the payment were in exchange for 'some' official act" and that the government was not required to identify the

---

129. 556 F.3d 923 (9th Cir. 2009), *abrogated by* Skilling v. United States, 561 U.S. 358 (2010).
130. *Id.* at 926.
131. *Id.* at 926–28.
132. *Id.* at 937.
133. *Id.* at 936.
134. *Id.* at 938.
135. *Id.*
136. *Id.*

Case 1:23-cv-00390-DHU-JFR   Document 1   Filed 05/05/23   Page 99 of 111

official act at or near the time that the benefit was provided to the public official.[137] The court then concluded that the jury instruction adequately stated the government's burden of proof:

> In the case of a public official who obtains money, other than a campaign contribution, the Government does not have to prove an explicit promise to perform a particular act made at the time of the payment. Rather, it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence as specific opportunities arise.
>
> Although "[n]o specific instruction to find an express *quid pro quo* was given," this instruction adequately stated the implicit *quid pro quo* element . . . The instruction tells the jury that it can only find a defendant guilty if it finds that she "knew that the money was given in return for taking some official action." It then elaborates that the government does not have to show an express promise, but the public official must understand that "she is expected as a result of the payment to exercise particular kinds of influence as specific opportunities arise." "[A]lthough the magic words *quid pro quo* were not uttered, a simplified version of the concept, the idea that 'you get something and you give something,' was."[138]

Likewise, the Third Circuit has held that Section 1951 does not require the prosecution to prove a corrupt intent and that the government was only required to prove an implied understanding.[139] In *United States v. Antico*, the defendant, who held various positions at the Department of Licenses and Inspections for the City of Philadelphia, was charged with extortion.[140] At trial, the government introduced evidence that the defendant was provided financial benefits in exchange for approving zoning, use permits, and licenses for several businesses.[141] The defendant was convicted and he appealed.[142] On appeal, the defendant argued that the district court failed to instruct the jury that the government was required to prove a specific *quid pro quo*.[143] The Third Circuit rejected the defendant's argument and held that the extortion statute contains no express *quid pro quo* requirement in the non-campaign contribution context.[144] The appellate court did

---

137. *Id.*
138. *Id.* at 937–38 (citations omitted).
139. United States v. Antico, 275 F.3d 245 (3d Cir. 2001), *abrogated by* Skilling v. United States, 561 U.S. 358 (2010).
140. *Id.*
141. 275 F.3d at 248–49.
142. *Id.* at 245.
143. *Id.* at 255.
144. *Id.* at 257; *see also* United States v. Salahuddin, 765 F.3d 329, 343 (3rd Cir. 2014) (to sustain a Hobbs Act conviction based on soliciting charitable contributions the government is not required to prove an explicit *quid pro quo*).

hold, however, that the phrase "under color of official right" requires the government to prove that the defendant accepted benefits with the implied understanding that he would perform or not perform an official act.[145] The court explained that: "The *quid pro quo* can be implicit, that is, a conviction can occur if the Government shows that [the defendant] accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity "under color of official right." [146]

The Sixth Circuit has held that Section 666's "intending to be influenced" and Section 1951's "under color of official right" mean the same thing—that the government is required to prove a connection between the benefit and some official act.[147] In *United States v. Abbey*, a City Administrator for Burton, Michigan was charged with both Section 666 and Section 1951 violations.[148] At trial, the government presented evidence that the defendant was given real estate in exchange for favorable treatment in connection with a decision that would affect a proposed real estate development.[149] The same evidence was used for both charges and the government did not introduce any evidence establishing that when the property was transferred to the defendant, there was an agreement to take a specific official act.[150] On appeal, the defendant argued that to sustain each of his convictions, the government was required to prove that the benefit was linked to a specific official act.[151]

The Sixth Circuit rejected the defendant's contention and held that the statutes do not contain such a heightened standard of proof that requires the prosecution to prove a corrupt intent.[152] The court held that this *"quid pro quo* requirement" was limited to when the benefit takes the form of a campaign contribution.[153] The court then acknowledged that a lesser *"quid pro quo* requirement applies to all" Section 666 and Section 1951 prosecutions.[154] The court tried to distinguish, in a less than clear way, the two standards of proof.[155]

---

145. *Id.* at 258. In *United States v. Munchak*, 527 F. App'x 191 (3d Cir. 2013), the defendants, County Commissioners in Lackawanna County, Pennsylvania, were charged with Hobbs Act extortion. At trial, the government introduced evidence that the defendants demanded payments in exchange for government contracts. The defendants were convicted and they appealed. On appeal, the defendants argued that the trial court erred when it instructed the jury that it could convict them of extortion and federal program bribery absent an explicit *quid pro quo*. The Third Circuit rejected this assertion and affirmed the conviction.

146. 275 F.3d at 258.

147. *United States v. Abbey*, 560 F.3d 513, 515 (6th Cir. 2009).

148. *Id.*

149. *Id.*

150. *Id.*

151. *Id.*

152. *Id.* at 518.

153. *Id.* at 517–18.

154. *Id.* at 517 (emphasis added).

155. *Id.* at 519.

However, it is doubtful that this effort added to the understanding of the government's burden of proof:

> [N]ot all *quid pro quos* are made of the same stuff. The showing necessary may still vary based on context, though all cases require the existence of some kind of agreement between briber and official . . . "Indeed, in circumstances like this one-outside the campaign context-[r]ather than requir[e] an explicit *quid-pro-quo* promise, the elements of extortion are satisfied by something short of a formalized and thoroughly articulated contractual arrangement (i.e., merely knowing that the payment was made in return for official acts is enough)." A public official thus commits extortion 'under color of official right whenever he knowingly receives a bribe.
>
> So [the defendant] is wrong in contending that, to sustain a Hobbs Act conviction, the benefits received must have some explicit, direct link with a promise to perform a particular, identifiable act when the illegal gift is given to the official. *Instead, it is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose.*
>
> Similar to his argument regarding the Hobbs Act, he contends that the district court failed to properly instruct the jury that, to sustain a conviction under *18 U.S.C. § 666*, the government must prove "a specific intent element" on [the defendant's] part "that there be a connection between [his] intent and a specific official act."
>
> By its terms, the statute does not require the government to prove that [the defendant] contemplated a specific act when he received the bribe; the text says nothing of a *quid pro quo* requirement to sustain a conviction, express or otherwise: while a "*quid pro quo* of money for a specific . . . act is sufficient to violate the statute," it is "not necessary." Rather, it is enough if a defendant "corruptly solicits" "anything of value" with the "inten[t] to be influenced or rewarded in connection" with some transaction involving property or services worth $5000 or more.
>
> . . .
>
> The district court's jury instructions were not improper for failing to include a requirement that the government prove a direct link from some specific payment to a promise of some specific official act.[156]

---

156. *Id.* at 517–18, 520–21. In *United States v. Turner*, 684 F.3d 244 (1st Cir. 2012), the defendant, a member of the Boston City Council, was charged with extortion. At trial, the government presented evidence that the defendant was paid cash in exchange for assistance in obtaining a liquor license. *Id.* at 254. In addition, the government presented evidence that the defendant denied receiving any payment. *Id.* The defendant was convicted and he appealed.

### E.  SECTION 666 FEDERAL PROGRAM INTEGRITY

Section 666 is intended to protect the financial integrity of state and local programs receiving federal funds and makes it a federal offense for a state or local official to demand or receive a payment "intending to be influenced."[157] Courts have typically identified the elements of the offense as follows: (1) the defendant must be an employee or agent of a state or local government agency;[158] (2) the agency must receive in excess of $10,000 in federal funding in any one-year period; (3) the employee or agent must demand or accept a benefit; and (4) the benefit must be in connection with any "business" or "transaction" in excess of $5,000.[159]

The term "bribery" or "kickback" is not used in the statute. The statute requires that the benefit must be given with intent to influence or reward a government agent "in connection with any business, transaction, or series of transactions."[160] Section 666 does not say "official act" but states "any business, transaction, or series of transactions."[161] Section 666 does not say "in return for," "because of," or "in exchange for." Rather, it says "in connection with."[162] Regardless, what makes providing a benefit to a public official a crime is the nexus between the benefit and any official "business" or "transaction." In essence, a reading of the statute in a way that does not define "intending to be influenced" as requiring a link between the benefit and an official act, would disregard the core legal element of the offense. Because the federal program statute is *in pari materia* with the honest services and extortion statutes, Section 666 offenses are limited to bribery and kickback schemes.[163]

---

On appeal, the defendant argued that the jury was not instructed that to sustain his conviction the jury was required to find that the payment was made in exchange for an official act and that the evidence was not sufficient to support the conviction. *Id.* The First Circuit rejected both of the defendant's contentions. The appellate court first held that the jury was instructed that to sustain an extortion conviction the government was required to prove a link between the payment and the official act — "at least an implicit, as opposed to an explicit, *quid pro quo* or reciprocity understanding is necessary." The appellate court then found that the evidence was sufficient and rejected the defendant's contention that the payment was merely a gift and not linked to any official act. *Id.* at 254–259.

157. 18 U.S.C. § 666(a)(2) (2012).

158. The defendant can either be the public official who solicits or accepts the bribe or the individual who pays the bribe.

159. 18 U.S.C. § 666(a)(2) (2012); United States v. Fernandez, 722 F.3d 1, 13 (1st Cir. 2013) ("Thus, the bribe can be 'anything of value' – it need not be worth $5000. The $5000 element instead refers to the value of the 'business' or 'transaction' sought to be influenced by the bribe.").

160. 18 U.S.C. §§ 666(a)(1)(B), (a)(2).

161. *Id.*

162. *Id.*

163. There are no other potential theories that could fall within the scope of the conduct precluded by the statute. The failure to disclose a conflict of interest or providing a gratuity do not require a corrupt payment and a nexus between a benefit and an official act and, therefore, would not fall within the scope of the statute. In *United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013), the defendants, a commonwealth Senator and a businessman, were charged with violating § 666. At trial, the government introduced evidence that the Senator promoted legislation favorable to the defendant's business

The courts, however, have not articulated such a clear evidentiary path to conviction and have imposed a lower standard of proof on the government. Courts have not required the government to prove a direct connection or identify the state action or conduct of government at or near the time that the benefit is provided to the public official; rather, to sustain a Section 666 conviction, the government must prove only that the benefits were provided to the public official to influence some official act. For example, the Eleventh Circuit has held that when the benefit does not take the form of a campaign contribution, the government can sustain a conviction by proving a connection between the benefit and some official act, as opposed to a specific official act.[164] In *United States v. McNair*, county officials of Jefferson County, Alabama and contractors were charged with numerous public corruption offenses related to a municipal sewer and wastewater repair and rehabilitation project.[165] At trial, the government presented evidence that the county officials overseeing the project received kickbacks from the contractors in exchange for construction and engineering contracts.[166] On appeal, the defendants argued that "intending to be influenced" requires a direct link between the benefit and a specific official act.[167] The Eleventh Circuit rejected the defendants' assertion and held that the government was not required to prove a direct link between the kickback and a specific official act.[168] The court explained:

> [W]e now expressly hold that there is no requirement in [Section 666] that the government allege or prove an intent that a specific payment was solicited, received, or given in exchange for a specific official act, termed a *quid pro quo*.[169]
>
> Importantly, § 666(a)(1)(B) and (a)(2) do not contain the Latin phrase *quid pro quo*. Nor do those sections contain language such as "in exchange for an official act" or "in return for an official act." In short, nothing in the plain language of § 666(a)(1)(B) nor § 666(a)(2) requires that a specific payment be solicited, received, or given in exchange for a specific official act.
>
> Simply put, the government is not required to tie or directly link a benefit or payment to a specific official act by that County employee.

---

interests at the same time he received travel and entertainment expenses. The defendants were convicted and they appealed. On appeal they argued that the trial court erred in instructing the jury that they could find the defendants guilty of a § 666 offense for offering and receiving a gratuity rather than a bribe. The First Circuit agreed and vacated the conviction. The court held that § 666 does not encompass illegal gratuities. The court explained that the statute specifically require that the government prove a corrupt payment. Therefore, to sustain a § 666 conviction, the government must prove a connection between the payment and an official act. *Id.* at 23–24.

164. United States v. McNair, 605 F.3d 1152, 1188 (11th Cir. 2010).

165. *Id.* at 1164–65.

166. *Id.* at 1164, 1169.

167. *Id.* at 1184–85.

168. *Id.* at 1187–88.

169. *Id.*

> The intent that must be proven is an intent to corruptly influence or to be influenced "in connection with any business" or "transaction," not an intent to engage in any specific *quid pro quo*.[170]

Nevertheless, the court did acknowledge, that the government was required to prove *some* connection between the payment and official act.[171] The court found that "sizable benefits" were provided with the intent to influence the county officials.[172] There was no evidence of gifts to the county officials before the projects began, and the extent to which the defendants attempted to conceal the benefits was "powerful evidence" of the corrupt payments.[173]

When the payment takes the form of a campaign contribution, the Eleventh Circuit has extended *McCormick* to Section 666 prosecutions and defined "intending to be influenced" to mean a direct connection between the payment and a specific official act.[174] In *United States v. Siegelman*, the former Governor of Alabama was charged with various public corruption offenses based on accepting a campaign contribution to an education lottery campaign in exchange for a political

---

170. *Id.* at 1187-88.

171. *Id.* at 1188–89.

172. *Id.* at 1196.

173. *Id.* The court also rejected the defendant's assertion that that benefits were "gifts" not bribes. *See id.* at 1194-95. In *United States v. Langford*, 647 F.3d 1309, 1331–32 (11th Cir. 2011), the defendant, a Commissioner for Jefferson County, Alabama, was charged with federal program bribery. At trial, the government introduced evidence that while he was serving as a Commissioner, the defendant accepted more than $240,000 in cash, clothing and jewelry from a local investment banker in exchange for steering municipal contracts involving the underwriting and marketing of municipal bonds to his firm. The defendant was convicted and he appealed. On appeal, the defendant asserted that a specific *quid pro quo* was required and that the government failed to prove a link between the benefit and a specific official act. The Eleventh Circuit rejected the defendant's contention and affirmed the conviction. In *United States v. Keen*, 679 F.3d 981 (11th Cir. 2012), the defendants, county commissioners for Dixie County, Florida, were charged with federal program bribery. At trial, the government introduced evidence that the defendant was provided cash by an undercover FBI agent in exchange for favorable decisions in connection with a fictitious development project. The defendants were convicted and they appealed. On appeal, the defendants argued that the evidence was insufficient to support their convictions. In particular, the defendants argued that the government failed to prove "which particular business or transaction before the Dixie County Board of Commissioners was connected to the bribes nor the value of the benefit to be attained through bribes." *Id.* at 994. The Eleventh Circuit rejected the defendants arguments and affirmed the conviction. The court explained that:

> This Court has made it clear that § 666(a)(1)(B) does not require the government to prove a specific official act for which a bribe was received. Rather, the government must show only that [the defendants] "corruptly" accepted "anything of value" with the intent "to be influenced or rewarded in connection with any business, transaction, or series of transactions" of the Board. That is precisely what the government did when it presented evidence that [the defendants] accepted bribes from [undercover FBI agent] with the understanding that they would facilitate the approval of zoning changes benefitting the fictitious company of "Sean Michaels."

*Id.* (citations omitted).

174. United States v. Siegelman, 640 F.3d 1159, 1171–72 (11th Cir. 2011).

appointment to the board that determined the number of healthcare facilities in the state.[175] At trial, the government introduced evidence that the campaign contribution was provided in exchange for the specific appointment.[176] On appeal, the defendant argued that district court erred in not requiring the jury to find a direct link between the campaign contribution and the specific appointment.[177] The court of appeals agreed that the *McCormick* standard applied to Section 666 prosecutions, and held that because the payment took the form of a campaign contribution, to sustain these convictions, the government was required to prove and the jury must find a direct link between the payment and a specific official act.[178] The court found, however, that the government had proven this direct nexus. The court explained that:

> The district court in this case instructed the jury that they could not convict the defendants of bribery in this case unless "the defendant and the official agree that the official will take specific action in exchange for the thing of value." This instruction was fashioned by the court in direct response to defendants' request for a *quid pro quo* instruction, and was given in addition to the Eleventh Circuit's pattern jury instruction for § 666 bribery cases. So, even if a *quid pro quo* instruction was required, such an instruction was given.[179]

The defendants further argued that the district court erred in not requiring the government to prove the link with direct, rather than circumstantial, evidence.[180] The court of appeals disagreed and held that the government could rely on circumstantial evidence even in cases where the government was required to prove a direct nexus to a specific official act:

> *McCormick* uses the word "explicit" when describing the sort of agreement that is required to convict a defendant for extorting campaign contributions. Explicit, however, does not mean *express*. Defendants argue that only "proof of actual conversations by defendants," will do, suggesting in their brief that only *express* words of promise overheard by third parties or by means of electronic surveillance will do. But there is no requirement that this agreement be memorialized in a writing, or even, as defendants suggest, be overheard by a third party. Since the agreement is for some specific action or inaction, the agreement must be explicit, but there is no requirement that it be express.
>
> . . .

---

175. *Id.* at 1163.
176. *Id.*
177. *Id.* at 1171.
178. *Id.* at 1171–72.
179. *Id.* at 1170–71.
180. *Id.* at 1171.

> In this case, the jury was instructed that they could not convict the defendants of bribery unless they found that "the Defendant and official agree[d] that the official will take specific action in exchange for the thing of value." This instruction required the jury to find an agreement to exchange a specific official action for a campaign contribution. Finding this fact would satisfy *McCormick's* requirement for an explicit agreement involving a *quid pro quo*. Therefore, even assuming a *quid pro quo* instruction is required to convict the defendants under § 666, we find no reversible error in the bribery instructions given by the district court.[181]

Finally, the defendant asserted that *Skilling* compelled the reversal of the honest services conviction because the jury was not instructed that the government was required to prove a *quid pro quo* in order to convict them on a bribery theory of honest services fraud.[182] The court, while declining to extend the *McCormick* standard to honest services fraud, nevertheless held that because the evidence sustaining the pay-to-play scheme was applicable to both the Section 666 charge and honest services fraud, the jury was properly instructed that they could not convict the defendant unless they found that the payment was linked to a specific official act.[183] The court correctly observed, however, that, "After *Skilling*, it may well be that the honest services fraud statute, like the extortion statute in *McCormick*, required a *quid pro quo* in a campaign donation case."[184]

In *United States v. Beldini*, the Third Circuit declined the opportunity to find that Section 666 was limited to bribery and kickback schemes and that the government was required to prove a direct link between the benefit and a specific official act.[185] In *Beldini*, the defendant was the Deputy Mayor of Jersey City, New Jersey, who reported directly to the Mayor.[186] An FBI Confidential Informant ("CI"), posing as a real estate developer, offered to make campaign contributions in return for the Mayor expediting approval for a fictitious real estate development project.[187] The defendant facilitated meetings with the Mayor and promised to work to provide the CI relief from existing zoning regulations.[188] Later, the CI made a second $10,000 campaign contribution that was funneled to the Mayor's campaign through third-party intermediaries.[189] The defendant was convicted and appealed.[190] On appeal, the defendant argued that the district court failed to instruct

---

181. *Id.* at 1171–72.
182. *Id.* at 1173.
183. *Id.* at 1173–74.
184. *Id.* at 1173 n.21.
185. United States v. Beldini, 443 F. App'x 709, 710 (3d Cir. 2011).
186. *Id.*
187. *Id.*
188. *Id.* at 711–12.
189. *Id.*
190. *Id.* at 710.

the jury that, to sustain the conviction, the government was required to prove a link between the payment and a specific act.[191]

The Third Circuit affirmed the conviction and rejected the defendant's argument.[192] Because the defendant failed to object to the district court's decision not to give a *quid pro quo* instruction, the Third Circuit held that the plain error standard applied.[193] Because there was no binding precedent requiring the government to prove a direct link between the benefit and an official act, any "error" in failing to instruct the jury was not plain, clear, or obvious to require a reversal under the plain error rule.[194] The appellate court applied the lower standard of proof and held that the government was only required to prove some connection between the benefit and some official action.[195]

In *United States v. McGregor*, four Alabama state lawmakers, several lobbyists, and gambling company executives were charged with federal program integrity, extortion, and honest services fraud.[196] At trial the government introduced evidence that suggested that campaign contributions were offered in return for official acts.[197] After the defendants were acquitted, the district court filed an opinion intended to provide guidance on the question of when a campaign contribution may be considered a bribe.[198]

The district court first recognized that to sustain a conviction for each offense, the government is required to prove a sufficient nexus between a benefit to a public official and an official act.[199] The trial court then explained that when the benefit to the public official takes the form of a campaign contribution, a heightened *quid pro quo* "standard" is warranted.[200] As a result, the district court gave the jury an instruction that required the government to prove a direct link between the campaign contribution and specific official act.[201]

---

191. *Id.* at 710, 714, 717.

192. *Id.* at 717, 721.

193. *Id.* at 713.

194. *Id.* at 717.

195. *Id.*

196. United States v. McGregor, 879 F. Supp. 2d 1308, 1310 (M.D. Ala. 2012).

197. *Id.* at 1311–12.

198. *Id.* at 1310.

199. *Id.* at 1314.

200. *Id.*

201. The district court's jury instruction stated that:

> Campaign contributions and fundraising are an important, unavoidable and legitimate part of the American system of privately financed elections. The law recognizes that campaign contributions may be given to an elected public official because the giver supports the acts done or to be done by the elected official. The law thus also recognizes that legitimate, honest campaign contributions are given to reward public officials with whom the donor agrees, and in the generalized hope that the official will continue to take similar official actions in the future. Therefore, the solicitation or acceptance by an elected official of a campaign contribution does not, in itself, constitute a federal crime, even though the donor

### F. DIRECT AND CIRCUMSTANTIAL EVIDENCE

Imposing the higher standard of proof on the government should not present an obstacle to conviction. In addition to identifying the state action or conduct of government close in time to when the benefit is provided to the public official, there are several ways that the prosecution can further support the evidence of a corrupt intent. Once the benefit is traced to the public official, the question remaining is whether there is a sufficient nexus between the benefit and state action and conduct of government. To prove this link, the prosecutor will examine the facts and circumstances surrounding the exchange, including: (1) the value of the benefit; (2) the timing of the benefit;[202] (3) the nature of the official act; (4) the value of the official act to the source of the benefit; (5) the relationship between the public official and source of the benefit; (6) any effort to conceal the payment; (7) the use of third-party agents as conduits for the benefit; (8) the falsification of any documents; (9) any effort to conceal the relationship between the public official and source of the benefit; (10) any effort to destroy evidence; and (11) the defendant's behavior before and after the corrupt scheme came under scrutiny. The defense will attempt to undermine the government's assertion by arguing that that the payment and official were not linked to any official act.[203]

---

has business pending before the official, and even if the contribution is made shortly before or after the official acts favorably to the donor.

However, when there is a *quid pro quo agreement*, orally or in writing, that is, a mutual understanding, between the donor and the elected official that a campaign contribution is conditioned on the performance of a *specific official action*, it constitutes a bribe under federal law. By this phrase, I mean that a generalized expectation of some future favorable action is not sufficient for a quid pro quo agreement; rather, the agreement must be one that the campaign contribution will be given in exchange for the official agreeing to take or forgo some specific action in order for the agreement to be criminal. A close-in-time relationship between the donation and the act is not enough to establish an illegal agreement.

A *promise* of a campaign contribution or a *solicitation* o f a campaign contribution may be an illegal quid pro quo, as well. But to be illegal (1) it must be a promise or solicitation conditioned on the performance of a specific official action as I explained that phrase in the preceding paragraph; (2) it must be *explicit*; and (3) it must be *material*. To be explicit, the promise or solicitation need not be in writing but must be clearly set forth. An explicit promise or solicitation can be inferred from both direct a n d circumstantial evidence, including the defendant's words, conduct, acts, and all the surrounding circumstances disclosed by the evidence, as well as the rational or logical inferences that may be drawn from them.

*Id.* at 1310–1311; 18 U.S.C. § 1951 (2012).

202. The receipt of a benefit for an official act that would have been taken *regardless* of the benefit violates the federal public corruption statutes. *See United States v. Derrick*, 163 F.3d 799 (4th Cir. 1998).

203. *See, e.g.,* United States v. White, 663 F.3d 1207 (11th Cir. 2011) (rejecting defendant's argument that cash payments were not taken with corrupt intent to influence an official act); United States v. Abbey, 560 F.3d 513 (6th Cir. 2009) (rejecting defendant's argument that there was no agreement to take a specific act when property was transferred to defendant).

Therefore, the facts and circumstance surrounding the payment and official act will be critical in determining the legitimacy of the benefit provided.

## IV. CONCLUSION

It is not a crime to provide a gift, loan, employment, or other financial benefit to a public official or those close to him. What makes such a practice corrupt and a federal criminal offense is when public officials abuse their position for financial gain and use their government positions and discretion over state action or the conduct of government as a lucrative financial opportunities for themselves, their family, friends, or associates. As a consequence, each of the federal public corruption statutes require that the government prove a sufficient nexus or connection between a financial benefit provided to a public official[204] and an official act. It is this agreement or corrupt intent that makes the conduct a federal criminal offense. Although the central legal element is this link between the benefit to the public official and official act, the courts have failed to provide the government with a path to conviction that is fundamentally fair to the defendant.

In *McDonnell*, the Supreme Court clearly expressed a concern about the exercise of prosecutorial discretion and the need for a fundamentally fair application of the law—that it should be applied as a "scalpel" rather than a "meat axe."[205] The courts have repeatedly used the term *quid pro quo* to describe the critical element of a bribery or kickback offense and have required the government prove a nexus between the benefit and official act. However, this term is used regardless of the form of the benefit or inducement provided to the public official. As a result, the term *quid pro quo* has been used to mean two different evidentiary requirements: that a payment was made to a public official in exchange for some official action, and that a payment was made in exchange for a specific official act. This is a significant distinction because the burden of proving a direct connection is significantly higher than proving some connection. The courts have imposed the higher burden of proof only when the benefit takes the form of a campaign

---

204. Corrupt payments are typically tendered with the intent to induce the following official acts: (1) provide government financial support for public and private projects; (2) favorable legislation or regulatory scrutiny; or (3) awarding government contracts. The form of benefit provided to the public official may include: (1) campaign contributions; (2) cash payments; (3) gifts of luxury items; (4) consulting fees; (5) travel and entertainment expenses and/or; (6) insider information regarding financial transactions. The scope of the benefits include benefits provided directly to the public official, family members and/or close associates. The benefits provided to or on behalf of the public official should be of some consequence. *See e.g., United States v. Newman*, 773 F.3d 438 (2d Cir. 2014) (holding that to sustain insider trading conviction the government must prove that the defendant received a benefit of some consequence).

205. *McDonnell*, 136 S. Ct. at 2373; *see also* United States v. Weimert, 819 F.3d 351, 370 (7th Cir. 2016) (reversing wire fraud conviction based on deceptive statements about negotiation positions and finding that the limits of the federal wire fraud statute must be "defined by more than just prosecutorial discretion."); United States ex rel. O'Connell v. Countrywide Home Loans, Inc., 822 F.3d 650, 658 (2d Cir. 2016) (reversing civil judgment and holding that breach of contract does not support fraud claim absent evidence of fraudulent intent not to perform the promise at the time of contract execution).

University of Denver Criminal Law Review, Vol. 7 [2023], Art. 3

76          UNIVERSITY OF DENVER CRIMINAL LAW REVIEW          VOL. 7

contribution. This is a distinction without merit. The criterion of guilt is the corrupt intent—not the form of the benefit provided to the public official. The lower evidentiary standard provides no comfort to justice. This lower standard is ambiguous, inconsistent, and allows for doubt. Ambiguous and inconsistent evidentiary standards rarely translate into meaningful jury verdicts or appellate review. Therefore, courts should jettison this distinction and uniformly impose a higher standard of proof. To trigger the corruption statutes, the courts should require the government to prove a corrupt intent—a direct connection between the benefit and intent to influence or affect state action or the conduct of government. Moreover, the courts should require the prosecution to identify this official act at the time the benefit is provided to the public official. This will result in clarifying the criterion of guilt and the fundamentally fair application of each of these federal corruption statutes.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail and Priority Mail International® shipm

Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; July 2022; All rights reserved.



**FROM:**

PO Box 99
Oakland, NJ
07436

**RECEIVED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

MAY 05 2023

MITCHELL R. ELFERS
CLERK

**TO:**

US District Court
District of New Mexico
Office of the Clerk
333 Lomas Blvd. NW)
Albuquerque, NM
87102

VISIT US AT USPS.COM®



**Retail**

UNITED STATES
POSTAL SERVICE.

**P**

**US POSTAGE PAID**

Origin: 07417
05/03/23
3327700703-11

**$19.40**

**PRIORITY MAIL®**

1 Lb 3.00 Oz

**RDC 04**

**C023**

EXPECTED DELIVERY DAY: 05/05/23

SHIP
TO:
333 LOMAS BLVD NW
ALBUQUERQUE NM 87102-2272

USPS SIGNATURE® TRACKING #

9510 8150 3007 3123 5515 71

**INSURED**